### UNITED STATES v. TWO CASES OF CHLORO–NAPTHOLEUM DISINFECTANT.

### (District Court, D. Maryland. June 22, 1914.)

**1. DRUGGISTS (§ 11*)—INSECTICIDE—MISBRANDING—FRAUDULENT INTENT.**

Absence of a fraudulent intent on the part of a shipper is no defense to proceedings for misbranding, in violation of the Insecticide Act (U. S. Comp. St. 1913, § 8765).

[Ed. Note.—For other cases, see Druggists, Cent. Dig. § 10; Dec. Dig. § 11.*]

**2. EVIDENCE (§ 363*)—TEXT-BOOKS—ADMISSIBILITY.**

Where an insecticide, sold under the name "chloro-naptholeum," was claimed to be misbranded, and the government sought to show that chlornapthol was a recognized chemical product, standard chemical books, produced from the library of the Department of Agriculture, were admissible, not as evidence of the opinions of the text-writers, but to show the state of the art or of the world's knowledge on the subject.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1516–1519; Dec. Dig. § 363.*]

**3. DRUGGISTS (§ 11*)—INSECTICIDE—LABELS.**

A word used on a label of an insecticide or other drug does not become purely arbitrary until it has lost its descriptive significance, both to the specialist in the subject and to the general public, so that, where common words are put on labels, they will be held to have been used in their popular meaning rather than that which they may have acquired among manufacturers and dealers.

[Ed. Note.—For other cases, see Druggists, Cent. Dig. § 10; Dec. Dig. § 11.*]

**4. DRUGGISTS (§ 11*)—INSECTICIDE—MISBRANDING—CHLORO-NAPTHOLEUM.**

Insecticide Act April 26, 1910, c. 191, 36 Stat. 331 (U. S. Comp. St. 1913, § 8765), provides that an article shall be deemed misbranded if it be labeled or branded so as to deceive or mislead the purchaser. Claimant had manufactured and for many years had sold an insecticide labeled "chloro-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Act July 1, 1898, c. 541 (Comp. St. 1913, § 9651).

naptholeum," which, however, did not contain as an essential ingredient chlorine or chlor-napthol. Chlorine, however, was shown to be a valuable disinfectant, and had been recognized as such since the close of the eighteenth century; and napthol is also well known as a powerful germicide, and as early as 1881 the name "chlor-napthol" had been given to a definite chemical compound. *Held* that, since the name, as applied to claimant's product, would be likely to deceive those having knowledge of chlorine and chlor-napthol, and their chemical character and attributes, claimant's substance was misbranded, though the word used by it had by long use, to the large majority of people, become associated with claimant's product.

·  [Ed. Note.—For other cases, see Druggists, Cent. Dig. § 10; Dec. Dig. § 11.*]

5. DRUGGISTS (§ 11*)—INSECTICIDES—"MISBRAND."

Under the Insecticide Act (U. S. Comp. St. Supp. 1911, p. 1372), goods are misbranded, if they bear any statement which will deceive or mislead purchasers who are of normal capacity and who use that capacity in a common-sense way.

[Ed. Note.—For other cases, see Druggists, Cent. Dig. § 10; Dec. Dig. § 11.*

For other definitions, see Words and Phrases, Second Series, Misbrand.]

Libel by the United States against Two Cases of Chloro-Naptholeum Disinfectant. Verdict for the United States. Motion for new trial ·denied.

John Philip Hill, U. S. Atty., and J. Craig McLanahan, Asst. U. S. Atty., both of Baltimore, Md.

Julius Wyman and Richard E. Preece, both of Baltimore, Md., and Stroock & Stroock, of New York City, for defendant.

ROSE, District Judge. This case arises out of a seizure under the tenth section of the Insecticide Act. The packages proceeded against were labeled "Chloro-Naptholeum." The libel says that such label constituted a misbranding. It charges that the words used conveyed, and were intended to convey, the meaning and impression· that the article contained as an essential ingredient chlorine or chlor-napthol. Claimant admits that it did not.

[1] The allegation that the words were intended to convey a false meaning is immaterial. Absence of fraudulent intent on the part of the shipper is not a defense to proceedings under the Food and Drugs or Insecticide Acts. United States v. Thirty-Six Bottles of London Dry Gin, 210 Fed. 271, 127 C. C. A. 119. There was a jury trial. It turned out, however, that the facts were not in dispute. The interstate shipment was admitted. The government put on the stand a number of expert witnesses of high qualification, among them, some of the most distinquished authorities on pharmacology, preventive medicine, and hygiene. They testified that chlorine was a valuable disinfectant. It had been recognized as such as far back as the close of the eighteenth century. It is now extensively used in purifying the water supplies of urban communities. Napthol is also a well-known and powerful germicide. As early as 1881 the name chlor-napthol had been given to a definite chemical compound. To chemists the name was descriptive. It conveyed to them a clear idea of the essential composition of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

product to which it was applied. Some years later the claimant's predecessors adopted "Chloro-Naptholeum" as the name for their disinfectant. The testimony showed that chlor-napthol is a powerful germicide. It is not hard to make, but except for laboratory purposes it is seldom made. The chemical witnesses all said that to them the name "chloro-naptholeum" indicated that the product so called contained chlorine or chlor-napthol as an essential ingredient, and that they so supposed until they learned otherwise. It was nevertheless admitted that claimant's disinfectant was reliable, valuable, and largely used. No attempt was made to controvert any of the testimony offered on behalf of the government. Claimant put witnesses on the stand to prove that the ordinary purchaser knows nothing about chlor-napthol. They testified that the people who bought chloro-naptholeum attached no significance to the name. They asked for it, because they· had used it before, or had heard of somebody else who had. While there was no great volume of such evidence, the government made no effort to dispute it.

The issue, therefore, became almost entirely one of law. No facts were in controversy. The jury, indeed, had the right to disbelieve any part of the testimony which did not seem to them credible. No reason was apparent, nor was any suggested, why the truthfulness of any of it should be questioned. There was no attempt to discredit the veracity or the knowledge of any of the witnesses. No request for an instructed verdict was, however, made. The case accordingly went to the jury. Their verdict was for the government. The claimant moved for a new trial on various grounds. At the hearing they resolved themselves into the contention that incompetent evidence had been admitted and that erroneous instructions had been given to the jury. Little need be said as to the rulings as to testimony, or as to any of the criticisms of the charge, except those going to the fundamental proposition of law involved.

At the argument it was stated that claimant had some months before the trial adopted a new name for its goods. It wanted to resume the use of the old so soon as its right to do so could be clearly established. What it and the government, therefore, both wish, is a final decision upon the merits. To prolong the litigation over technical questions would do harm to everybody. It does not appear, however, that on such questions any error was made.

[2] The government sought to show that chlor-napthol was, as early as 1881, a recognized chemical product, and that at various dates before and since certain specific things were known to chemists. For that purpose it produced from the library of the Department of Agriculture various books published here and abroad. It proved that they were standard works on the subjects to which they related. Their title pages were offered in evidence to establish the dates and places of their respective publications. The claimant objected to their admission, on the ground that their publication had not been properly proved. They were admitted. No question arose as to the admissibility of the opinions of text-writers. The books were not offered for such purpose. They were let in, as in patent cases, to show what at a particular time was the state of the art or of the world's knowledge. For such pur-

poses they are clearly admissible. 4 Chamberlayne, Modern Law of Evidence, § 2755.

Proceedings in these cases are expressly assimilated to those in admiralty. Under the liberal rules of that forum, sufficient prima facie proof of the date of the publication of the books in question was given.

It was urged that the court in its charge to the jury had too freely assumed that testimony which was uncontradicted was true. At the close of the charge claimant was given an opportunity to call attention to any errors which it supposed had been made. It specified the respects in which it thought the court had taken for granted things which it was entitled to question. The jury were then distinctly told that all such issues were for them, and that theirs was the responsibility for the decision thereon.

[3] In substance the jury were instructed that a word does not become purely arbitrary until it has lost its descriptive significance both to the specialist in the subject and to the general public. In this circuit it has already been determined that, where words in every day use are put upon labels, they will be held to have been used in their popular meaning rather than that which they have acquired among manufacturers and dealers. Libby, McNeill & Libby v. United States, 210 Fed. 148, 127 C. C. A. 14.

[4] In the case at bar the words in controversy were not in everyday use. Only a few people accurately knew their meaning. Nevertheless they had a definite and precise one. That is now what it was at and before claimant's predecessors by accident or design adopted the phrase, or what appears to be an obvious variant thereof, as the name of their product. Moreover the very thing to which it properly belonged could be used, and in some respects at least was well adapted for use, for the very purposes for which claimant's goods were offered for sale. Claimant says, conceding all this, its wares have by that name been on the market for about 30 years. Those who know of the words only in connection with its product are at least 100 times as numerous as those who ever knew what their real meaning was and is.

It contends that in law their only present significance is what it has given to them. By usage and common acceptation they have come to mean, not the definite, known chemical compound, but the disinfectant made up by it according to its secret proprietary formula. The fact that as it uses the words they would still mislead and deceive chemists and other persons familiar with chemical terminology is in its view immaterial. The question is so important that I have felt that more thought should be given to it than was possible in the hurry and rush of a jury trial.

Claimant relies upon such cases as United States v. 40 Barrels of Coca-Cola (D. C.) 191 Fed. 431. In so doing it loses sight of the fact that those cases were decided as they were largely, if not solely, because the names which the government attacked were in the opinion of the court protected by the first proviso of the eighth section of the Food and Drugs Act (Act June 30, 1906, c. 3915, 34 Stat. 771 [U. S. Comp. St. 1913, § 8724]) which reads:

"That an article of food which does not contain any added poisonous or deleterious ingredients shall not be deemed to be adulterated or misbranded

* * * in the case of mixtures or compounds which may be now or from time to time hereafter known as articles of food, under their own distinctive names, and not an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement of the place where said article has been manufactured or produced."

The Insecticide Act was not passed until nearly four years after the Food and Drugs Act had gone upon the statute book. Various questions under the former had been raised before the latter was enacted. A comparison of the text of the two shows that the draftsman of the Insecticide Act took the Food and Drugs Act as his model. The larger part of it he copied verbatim. Where he did not it was obviously because he had a definite purpose in departing from it. United States v. 30 Dozen Packages Roach Food (D. C.) 202 Fed. 271. A word here or there might have been left out or altered as the result of a clerical mistake. Changes of another sort are clearly significant. The first proviso of the eighth section of the Food and Drugs Act is not to be found in the Insecticide Act, nor is there any substitute for it. Its exclusion could not have been accidental. It must have been intended. Congress clearly did not wish the administration and enforcement of the younger act to be embarrassed by any of the controversies of which the proviso in the older had been so fruitful a mother.

Claimant cites many trade-mark and unfair competition cases to show that words originally descriptive may by long and exclusive use in connection with one dealer's goods acquire a secondary meaning. Iron-Ox Remedy Co. v. Co-operative Wholesale Society, Ltd., 24 Patent & Trade-Mark Cases, 425. That is so. In all or nearly all of such cases, certainly in those which are in this respect best considered, there was evidence that the second comer wanted to use the words in controversy so that he might the more readily pass off his goods as those of the first. By so doing he proved to demonstration that in his belief those words had come to imply to the public that the goods upon which they appeared were of the plaintiff's production or selection. He at least was estopped to say otherwise. Under such circumstances the courts, to illustrate by the facts of a leading case, care little whether both the so-called camel's hair beltings or only one or neither contained any camel's hair, or, if it did, how much. Reddaway v. Banham, Law Reports (1896) Appeal Cases, 199. It is perfectly true that, if in any such case it appears that the plaintiff has been himself perpetrating a fraud upon the public, no assistance will be given him against one who has simply improved on his teaching. Manhattan Medicine Co. v. Wood, 108 U. S. 218, 2 Sup. Ct. 436, 27 L. Ed. 706.

It would be unsafe, however, to infer that in every such case in which relief has been given the plaintiff the court would have held him guiltless as against a proceeding instituted by the public under such an act as this. It is quite possible that there may be cases in which the courts will act at the instance of the official representatives of the people when they would stop their ears to the thou alsos of a detected cheat. Such speculations may or may not be far afield. It

is more to the purpose that a plaintiff in trade-mark or unfair competition cases will seldom or never be denied relief on the ground that he is deceiving the public, unless the intent on his part so to do is demonstrated by his acts. Good faith is not a sufficient defense against a proceeding like this.

Under this and analogous acts the federal government and the several states do not require the producer, the dealer, or the shipper to tell anything about his goods. There are exceptions to this rule, but there are not many. In most respects he may be as silent or as loquacious as he pleases. All that the law demands is that, if he speaks, he shall tell the truth. He is under no obligation to tell the whole truth. He is bound to tell nothing but the truth. The trouble is that words are not always tools of precision. They may mean one thing in one connection or at one period and something else at another. Some words may be used to convey almost directly opposite meanings. "Let" may mean either "to permit" or "to prevent." A word such as "admire" may signify one thing in one century and quite a different thing in another.

Claimant says that it has given the words it uses the only meaning they have to the purchasing public; that no matter what they once meant, no matter what they now mean to chemists and learned men, they mean its goods and nothing else to the people. It says that the purchasers know that the name is not descriptive. Is that true? Most of those who buy it or use it may not know what its name describes. It does not necessarily follow that they know it is not intended to describe anything. They or many of them may very naturally suppose that it does describe something, although what that something is they may not know accurately or at all. Once in a while some of them may become curious, and may ask some one who is more or less well posted on chemical subjects. He tells them what the words imply as to the composition of the article. Thereafter the label misleads and deceives them, if it did not before.

As I pointed out to the jury, if the claimant is right in the law for which it contends, there are products, which may be lawfully shipped into one neighborhood, while it would be against the law to send them into another. A name or a term, the meaning of which is accurately known in one community, may be without significance in another. If the rightful name of one thing may be applied by a dealer to something else, which he sells for a purpose for which the genuine article would be useful, all sorts of complications may arise. When he first used the title, the real thing, although known to chemists, may have been very little used. After he had long employed the phrase, some one found out how to make the genuine thing cheaply. It proved to be singularly efficient for the very purposes for which he had been selling his. Newspapers and magazines began to talk about it and to describe its properties. The further use of its name for his product would obviously from every standpoint be highly deceptive. It always did deceive those who knew of the genuine thing. That it did not at first do much harm was due solely to the fact that there were few who did know.

The claimant contends that it violates no law because that which deceives the best informed does not deceive the ignorant, and because on this particular subject the ignorant are in a great majority.  As a matter of fact it is utterly impossible for any court or for any jury to tell how much of the knowledge that the few have disseminates itself through the mass of the population in a more or less inaccurate guise.  Chlorine has recently been extensively used by municipalities and other public bodies as a germicide.  Its properties have thus been brought to public attention.  The world is now reading much about the transmission of disease by bacteria, microbes, and insects.  More and more people are becoming interested in the chemicals which are useful in destroying them.  Among these napthols are included.

[5]  The act says an insecticide is misbranded if it bears any statement, design, or device regarding such article or the ingredients or substances contained therein which is false or misleading in any particular.  The undisputed evidence in this case is that if the words "Chloro-Naptholeum" are to be understood in the sense they have to those people to whom they have any meaning at all, they are false and misleading.  The act goes on to say that for its purposes an insecticide shall be deemed to be misbranded if, among other things, it be labeled or branded so as to deceive the purchaser.

In this case the libel has alleged that the purchaser would be so deceived or misled.  The case has consequently been tried on that issue.  It is at least doubtful whether the broad definition first given is limited by the subsequent specifications of various things which are to be deemed misbranding.

In the Food and Drugs Act, from which both the more embracing language and this specification are literally copied, it is not, for the particulars are preceded with the statement that "for the purposes of this act an article shall *also* be deemed to be misbranded" etc.  The same phraseology is found in the Insecticide Act, except that the word "also" is omitted.  An examination of the contents of that section does not suggest that such omission could have been made for the purpose of affecting the construction to be put upon it.  The question is, perhaps, more interesting than important.  Doubtless an article is not misbranded, even within the first definition, unless the statement is false and misleading in a particular which will deceive a purchaser.  The whole object of perhaps all of these laws is to prevent the deception of purchasers.

Claimant assumes, however, that it has the right to deceive some purchasers provided it does not deceive many.  The language of the act does not suggest such an interpretation.  If it did, some curious results would follow.  Take the case of an article which has commanded a large sale.  Nevertheless some persons would not buy it.  They had an idea that it contained a particular constituent which they regarded as dangerous.  There were not many people who thought so.  The great body of the consumers never even so much as heard of the thing which the small minority dreaded.  The majority never gave a thought or care as to whether it was or was not present.  The manufacturer of the goods adds to his label the statement that it does not

contain this particular ingredient. If the statement is untrue in fact, there can be no question that the goods are misbranded. It will be immaterial that 9 out of 10 or 99 out of 100 of those who buy the article pay no attention whatever to it and are not in the slightest degree interested as to whether it is or is not accurate. Goods are misbranded if they bear any statement which will deceive or mislead any purchasers who are of normal capacity and who use that capacity in a common sense way. Whether there be many or few so deceived is not material. Whether an article is or is not misbranded does not depend upon the guess court or jury can make as to the relative number of purchasers who would vote "yes" or "no" if a referendum were possible as to whether they had or had not been deceived.

Claimant points out that for many years it has sold large quantities of its product under this particular name. It has done no harm to anybody. It asks why it should be compelled to incur all the trouble and expense of familiarizing the purchasing public with a new name for the old thing. There is no doubt that to do so will be both costly and inconvenient. Nevertheless it must be borne in mind that in the long run the honest manufacturer, as claimant doubtless is, is the one principally interested in the strict, and in even the rigid, enforcement of laws of this character. The more candid all his competitors are required to be, the better for him. Standards impossible of unvarying application will work to his injury. He cannot afford to say anything about his goods which is not in every reasonable sense, and from the standpoint of every well-informed person, true. If he is a law-abiding man, he does not want to take the chance of doing something which may be held to be illegal. He is always likely to have competitors who are perfectly willing to.

The motion for a new trial is denied.