Vernell BRAUN, Plaintiff-Respondent,

v.

ROUX DISTRIBUTING COMPANY, Inc., a Corporation, Defendant-Appellant.

No. 45770.

Supreme Court of Missouri,

Division No. 2.

April 14, 1958.

Rehearing Denied May 12, 1958.

Rexford H. Caruthers, H. Jackson Daniel, Husch, Eppenberger, Donohue, Elson & Jones, Arthur J. Freund, St. Louis, for plaintiff-respondent.

Moser, Marsalek, Carpenter, Cleary, Jaeckel & Hamilton, G. W. Marsalek, St. Louis, William J. Hayes, New York City, of counsel, for defendant-appellant.

BARRETT, Commissioner.

Upon the allegation of negligence in failure to warn of the presence of a toxic ingredient, paraphenylenediamine, in its hair dye, resulting in allergic periarteritis nodosa, the plaintiff, Vernell Braun, has recovered a judgment against the distributor, Roux Distributing Company, in the sum of $85,000.

Mrs. Braun, age 38 in 1956, is a housewife, the mother of two children, ages five and three. She attended a beauty college in 1934 and was an "all-around" beauty operator for two and one half years, and for about fifteen years operated a power machine in a shoe factory—until her first baby was born. Roux Laboratories, Inc., of New York, manufactures a line of cosmetics distributed by Roux Distributing Company, a company wholly owned by the president of the manufacturing company. Since 1934 they have manufactured and sold Roux Oil Shampoo Tint, a hair dye which contains paraphenylenediamine, a coal-tar derivative. Between 1934 and 1955 they manufactured and distributed in excess of 50 million packages of hair dye, possibly 75 million applications, without, to their knowledge, systemic injury to anyone using the product. Roux Oil Shampoo Tint—paraphenylenediamine hair dye—mixed with an equal amount of 20 volume hydrogen peroxide oxidizes and when applied attaches to the keratin, the constituent chemical basis of hair, and gives color to hair. In another connection it has been said that 95% of all hair dyes contain paraphenylenediamine and that there are approximately 65 million applications of hair dye a year. Phillips v. Roux Laboratories, 286 App.Div. 549, 145 N.Y.S.2d 449. Paraphenylenediamine has been used in industry for years, to dye feathers, fur, wigs and leather.

Roux dye has a paraphenylenediamine chemical content of 0.174% or $\frac{1}{20}$ to $\frac{2}{20}$ per cent. It was estimated in this case, by a plaintiff's witness, that 3 to 4 per cent of all users of hair dye are allergic or sensitive to it, a defense witness estimated that one in forty or fifty thousand applications resulted in a reaction. In compliance with the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq., particularly in connection with its misbranding and adulteration provisions, every cosmetic (Byrd v. U. S., 5 Cir., 154 F.2d 62), including Roux Oil Shampoo Tint, contains this warning on the labels, "Caution—This product contains ingredients which may cause skin irritation on certain individuals and a preliminary test according to accompanying directions should first be made. This product must not be used for dyeing the eyelashes or eyebrows; to do so may cause blindness." 21 U.S.C.A. §§ 361–364. One of the defendant's doctors conceded that paraphenylenediamine is a known sensitizer. According to the plaintiff's evidence it is also a toxic substance which after continued use or exposure, depending on the concentration, sensitizes normally healthy people. Or, to put it another way, on the first exposure there may be no reaction but upon subsequent exposures antibodies are built up in the tissues and eventually an exposure produces an allergic reaction. The plaintiff's witnesses, some of them, testified that Mrs. Braun's sensitiveness or allergy to paraphenylenediamine would not have been revealed by the prescribed preliminary patch test.

Periarteritis nodosa is an inflammatory disease of the coats of the small and medium-sized arteries, marked by symptoms of systemic infection. It is a very rare and usually fatal malady. There have been between two and four hundred known instances of the disease since its description or discovery eighty or ninety years ago and, partially because of the difficulty of accurate diagnosis, most of the cases were identified and diagnosed by autopsy. Usually the cause of the disease is unknown, but "around 1930," according to a defense witness, physicians began connecting the disease with "some sort of allergic or senitization phenomenon." Some known,

or said to be known, causes of the disease—some of the witnesses said that the definite cause had never been stated—are drugs, kidney infections, serums of all kinds, blood transfusions, sulpha drugs, penicillin and phenobarbital. Both plaintiff and defense witnesses all concede, unless the present case is an instance, that there has never been either a reported or an established case of periarteritis nodosa caused by paraphenylenediamine hair dye. The plaintiff's regular physician, after a muscle biopsy, diagnosed her illness as periarteritis nodosa, adding "allergic periarteritis nodosa." The defendant did not dispute the accuracy of the diagnosis, one defense witness who casually examined her and her case history in the presence of her doctor said, "I have no reason to disagree; this case had been diagnosed polyarteritis (a synonym) nodosa, and I have no reason to disagree with that diagnosis." It was the opinion and position of the doctors testifying for the defendant that the cause of the malady was not known, that plaintiff's case, if she had the disease, was not caused by the paraphenylenediamine hair dye but may have been due to other infectious illness or to other medication.

In October or November 1952, Mrs. Braun purchased a package of Roux Oil Shampoo Tint and her sister, an experienced beauty operator with twenty years' experience. including the use of Roux dye, dyed her hair. They first read the instructions and made the prescribed preliminary patch skin test and, there being no reaction "within the next twenty-four hours," applied the dye according to directions. (There has been one case, incidentially, based solely on the inadequacy of the prescribed pretest use. Phillips v. Roux Laboratories, supra.) Thereafter, every five or six weeks, approximately twenty times, until March 31, 1955, plaintiff's sister "retouched" her hair by applying the dye to the "new growth hair" —all without any reaction or noticeable ill effect. There was one exception, on the

next to the last retouching the plaintiff complained of her scalp itching, her sister examined it and noticed only a "pinkish" scalp. At each retouching Mrs. Braun and her sister read the directions as to retouching only and that part of the directions did not then call for a preliminary patch test as they subsequently did—"before every application including retouch applications."

On March 31, 1955, Mrs. Braun purchased the final package of Roux dye and about 12:30 that afternoon her sister again retouched her hair, beginning at the scalp and "slightly into the hairline." They followed directions and after leaving the dye on for about thirty minutes shampooed her hair with Shasta Shampoo. On other occasions they had used Glo Shampoo and Marrow Oil Shampoo. Also on other occasions, for her permanent waves, they had used Lilt Home Permanent which contains ammonium thioglycolate. March 31, 1955, fell on Thursday; on Friday, April 1st, she had an appointment with her doctor, the internist who eventually diagnosed her present illness, for a periodic checkup. She kept the appointment and gave a history of a recent respiratory infection. or cold but an examination revealed, except for a nasal congestion, that she was in normal good health, and a urinalysis "was likewise within normal limits." By Saturday, April 2, however, she noticed large blotches on her legs, within a few hours her legs were swollen and by Sunday she was quite ill. She had called the doctor on Saturday and he saw her late that night and "felt that she had an allergic reaction—what we call an allergic purpura." She had a temperature, there was swelling in the ankles, legs and hands. Her father's death intervened and she was not hospitalized until April 6th and, after various tests, including a muscle biopsy by a pathologist, her illness was diagnosed as "allergic periarteritis nodosa."

As indicated in the beginning, the plaintiff's theory of the defendant's liability was that in the briefly noted circumstances

the defendant had breached its duty and was guilty of "a negligent failure to give an adequate warning of the danger to consumers of systemic injury because of acquired sensitivity to defendant's product." Upon this appeal the defendant does not directly challenge or question its general basic duty and, consequently, it is not necessary to enter upon a discussion of the subject. The defendant does contend, however, that the plaintiff failed to make a submissible jury case for the reason that her entire case is based upon sheer speculation, guesswork and conjecture. To illustrate, it is said that "It is mere conjecture—a matter of opinion—whether or not plaintiffs illness originated after her use of defendant's product on March 31, 1955." It is argued that it is "wholly speculative—a matter of opinion—whether or not plaintiff's illness was the result of allergy or hypersensitivity." It is contended that it is "nothing but guesswork—a matter of opinion" whether plaintiff was hypersensitive to defendant's product and, in connection with these two and the last assignments, it is urged that the plaintiff may not add inference to inference to make a submissible case, or add a third and a fourth speculative inference to prior speculative inferences to make a case for the jury. The appellant's fourth point upon the essential merits of the appeal is that the plaintiff did not make preliminary patch tests prior to retouching and that it is "strictly a matter of guesswork" whether a patch test prior to March 31, 1955, would have revealed a sensitivity to defendant's product.

First, as to the latter assignment, as indicated, it was the plaintiff's proof and theory that a patch test would not have revealed her sensitivity, that is, her particular allergic reaction to the dye. Repeated or other patch tests than the initial one might have revealed a local or skin sensitivity, manifested by some form of skin reaction, but not her type of toxic, systemic allergic reaction. As we under-

stand the record and plaintiff's theory, the original directions did not require a preliminary test for retouching (Schilling v. Roux Distributing Co., 240 Minn. 71, 59 N.W.2d 907), as they should have, but she does not concede that such a warning would have satisfied the defendant's duty or that such a requirement would have been a sufficient warning for her particular type of allergic reaction and resulting malady. As a matter of fact the plaintiff's evidence does not show in specific detail just what warning could or should have been given except the fairly drawn inference that there could and should have been a warning of possible systemic injury, such as was in fact required and given for possible eye injury, even blindness, if applied to the eyelashes or eyebrows.

In this particular connection and before proceeding to the crux of the appeal it is probably best to further interpolate and consider the defendant's subsidiary contention that the court erred in admitting in evidence a list of medical articles which had no probative value in that the medical cases reviewed in the articles were not shown to have been in any way similar to plaintiff's use of defendant's product. The argument and assignment are beside the point; the articles were not offered as substantive proof of the fact or truth of their contents or because of any supposed similarity of occurrences but upon the essential element and theory of plaintiff's case that the defendant knew or should have known of the unreasonable risk and foreseeable danger (2 Harper & James, Torts, Secs. 28.6–28.9, pp. 1546–1555) of serious systemic injury to some people from the use of paraphenylenediamine in its hair dye. Arnold v. May Department Stores, 337 Mo. 727, 85 S.W. 2d 748; Evinger v. Thompson, 364 Mo. 658, 265 S.W.2d 726; annotation 26 A.L.R. 2d 963; Solazzo v. Occhino, 4 Misc.2d 630, 158 N.Y.S.2d 845; 41 Va.L.R. 145. For a recent case in which there was among other shortcomings a failure to

prove that captan, a gas odorizer, was toxic and harmful to anyone see Eddy v. Missouri Public Service Co., Mo.App., 309 S.W.2d 4.

The evidence complained of was this: One of the plaintiff's expert witnesses, a dermatologist who would not treat the malady and who had seen three or four cases of periarteritis nodosa in his life (in three of which the cause was not established and one of which was diagnosed as due to hypertension), testified that paraphenylenediamine was a known "potent sensitizer." To show knowledge of that fact and of the known or suspected harmful effects of paraphenylenediamine by medical science and therefore that the defendant, its chemists and medical consultants should have known, the doctor consulted the "Cumulative Index Medicus" and prepared a list of twenty-three articles in periodical medical literature concerning paraphenylenediamine and its effects on animals and human beings. While the doctor seemed to think, merely because the articles appeared in medical journals, that the fact of their publication was some evidence and assurance of their authenticity, the objection was to the hearsay nature of the evidence and to the doctor's expressing his opinion as to the value of the opinions expressed by others which, of course, would be improper. Phillips v. Roux Laboratories, supra. But here the evidence was not offered for that purpose and the doctor did not in point of fact testify to the authenticity of the opinions expressed in the articles. The fact was that the articles were only listed, giving the subject and author (not their content), and the evidence was offered for the stated, limited purpose of establishing that the information was available and, therefore, that the defendant knew or should have known that paraphenylenediamine was dangerous. One of the articles was in a French journal, another was in Finnish, but there was no objection to specific articles or any attempt to separate those dealing with animals from those dealing with human beings, neither was there any attempt to separate those dealing with serious systemic injuries from those dealing with simpler cases and problems of local injuries and dermatitis.

Nevertheless, in manufacturing and distributing hair dye, the appellant is held to the skill of an expert in that particular business, "to an expert's knowledge of the arts, materials and processes," and is bound to keep reasonably abreast of scientific knowledge and discoveries concerning his field and, of course, is deemed to possess whatever knowledge is thereby imparted. 2 Harper & James, Torts, Sec. 28.4, p. 1541; 2 Wigmore, Evidence, Sec. 665(b), p. 784; U. S. v. Two Cases of Chloro-Naptholeum Disinfectant, 217 F. 477. Another of the plaintiff's experts testified that medical information as to the lurking dangers of paraphenylenediamine had been available for thirty years and no complaint is now made of that testimony. One of the defendant's experts, in a hearing before the Delancy committee in 1952,[1] before which the defendant's president was a witness, testified that paraphenylenediamine was one of "the most dangerous of all cosmetics" and had been known to cause liver damage and optic neuritis. Thus, the evidence was partially cumulative. Evinger v. Thompson, supra. In addition, there was no oral request or offer of instructions specifically delimiting the force and effect of the evidence and in all the circumstances the court did not so err in admitting the evidence as to compel the granting of a new trial.

And now to return to the appellant's essential claim that the plaintiff's case and the defendant's liability are strictly a

1. Hearings Before The House Select Committee To Investigate The Use Of Chemicals In Foods And Cosmetics; Eighty-Second Congress (1952) H.Res. 74 and H.Res. 447.

matter of guesswork, speculation and conjecture,—an unpermitted piling of inference upon inference. In response to the appellant's contentions the respondent asserts that "defendant's sole contention is that a submissible case was not made by plaintiff on the issue of *proximate causation* between the use of defendant's product, Roux Oil Shampoo Tint, and the disease plaintiff suffered, periarteritis nodosa." The plaintiff then argues that her evidence showed the onset of her disease, March 31, 1955, that it was due to allergy, that her acute allergic reaction was caused by the paraphenylenediamine and that the opinion evidence on each of these subjects was based on fact and hence, that proximate cause was established or was a fact reasonably to be found by the jury and did not require the piling of inference upon inference.

■ As has been pointed out heretofore, it is doubtful that there is any such thing as a rule of either evidence or practice against piling inference upon inference (Van Brock v. First National Bank, 349 Mo. 425, 431, 161 S.W.2d 258, 261; 1 Wigmore, Evidence, Sec. 41, pp. 434–440); if so perhaps it is but a convenient way of guarding against what the court regards as "attenuated reasoning" on the part of the jury, or evidence thought to be too remote or uncertain or lacking in probative force. Wills v. Berberich's Delivery Co., 345 Mo. 616, 134 S.W.2d 125. In any event, the rule is an unsatisfactory method of resolving legal problems (2 Harper & James, Torts, Sec. 19.4, p. 1071), particularly this one, and does not as a matter of fact sharply present the real or actual difficulty involved. Likewise, the plaintiff's claim and argument that the problem is solely one of "proximate causation" is beside the mark. Prosser, Torts, pp. 218–223. The question raised here by the defendant's claim of speculation, guesswork and conjecture presents the more fundamental problem of whether, upon the whole record, the defendant's general duty being assumed, the plaintiff's evidence is of such substantial, probative force that a jury should be permitted to find liability. 49 Mich.L.R. 253; 2 Harper & James, Torts, Secs. 28.8, 28.13–28.14, pp. 1551,.1562–1569.

Merrill v. Beaute Vues Corporation, 10 Cir., 235 F.2d 893, Bennett v. Pilot Products Co., 120 Utah 474, 235 P.2d 525, 26 A.L.R.2d 958 and Briggs v. National Industries, 92 Cal.App.2d 542, 207 P.2d 110 (these and many other authorities mentioned not cited by counsel, incidentally), bring sharply into focus and distinguish the appellant's essential position here. The Merrill case alone will suffice for purposes of illustration and discrimination. There a lady claimed eye injury after using the defendant's Nutri-Tonic home permanent, the offending toxic ingredient was said to be ammonium thioglycolate, a substance used in most home permanent wave solutions (frequently mentioned by defense counsel in this case because Mrs. Braun had several home permanents). There, after a jury answered special interrogatories in favor of the plaintiff, the trial court sustained defendant's motion for judgment notwithstanding the verdict on the ground that the evidence was insufficient to support the finding. The plaintiff's attending physician testified to the injury to her optic nerves; he did not testify that thioglycolate was poisonous (toxic) or that it was likely to injure any users. To show that fact plaintiff relied on two medical articles which expressed the opinion that thioglycolate had caused toxic reactions; the article cited five instances, none of optic nerve injury, of toxic reactions from exposure to this particular ingredient. It is not necessary to quote from the opinion but the court, by a two to one vote, affirmed the trial court's decision and held, first, that it had turned out that the apprehensions of the doctors were unfounded (a conclusion about which there is still some question), since it had been found from the industry's "using human subjects for experiment, that the use of the product resulted in no evidence of systemic poisoning and was safe for general use." The result

of this investigation was published in the American Medical Association Journal. The majority opinion then followed and applied what, for the sake of brevity, may be called the allergic or unusually susceptible rule of nonliability. Annotation 26 A. L.R.2d loc. cit. 966. There have been various explanations of these cases. Of the California case an excellent student note said, "In view of the lack of evidence of previous injuries from a similar solution of thioglycollate acid or of medical knowledge that thioglycollate acid was a potent allergen, the court's decision is undoubtedly correct. But if the court meant that actual knowledge of the dangerous character of the product is an essential element of liability, its opinion is extremely doubtful." 49 Mich.L.R. 253. Harper and James make these comments or explanations of the Utah and California cases: "If the maker is justifiably ignorant of a danger in his product there is no negligence in a failure to guard against it." They add, however, that the manufacturer is in a most favorable position to learn the nature of his product. 2 Harper & James, Sec. 28.7, p. 1550. In the next section, Sec. 28.8, p. 1551, speaking of these cases, they say, "If the danger of such an allergy is known or should be known to the maker, and if the consequences of the idiosyncrasy are serious enough, reasonable care may well require the taking of some precaution such as warning and instructions for making tests." In a footnote they again add that in the California and Utah cases "such knowledge was lacking." The Merrill case is the subject of a recent student note which suggests that the case turns on "the actual knowledge of the manufacturer that there is a risk of injury to the user." This note collects and makes an evaluation of the Missouri cases. 22 Mo.L.R. 223–227.

■ Obviously, the plaintiff's evidence is not as conspicuously impressive and satisfying as one might wish, but that may be a problem in professional standards, individual integrity, and awareness of the grave responsibility involved in testifying to matters about which there is in fact no accurate or reliable scientific or medical knowledge and information. Perhaps all the gentlemen who testified in this case were eminently qualified (McCormick, Evidence, Secs. 13, 15, pp. 28, 32); in any event, there was no objection to their qualifications and it is not demonstrable upon this record that their opinions were in point of fact wholly without either factual or scientific basis and were, therefore, unfounded conjecture and speculation as was the demonstrable fact in Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844. As the appellant urges, periarteritis nodosa is a very rare malady and there is but little reliable medical knowledge concerning the subject, even when the disease has been accurately diagnosed its cause has remained in doubt or unknown. Nevertheless, plaintiff's doctor, an internist, diagnosed her illness as periarteritis nodosa and the defendant's doctors did not question the diagnosis, and so, for the purposes of this case, it is an established fact that she has the disease. She was examined on Friday, April 1, and found to be in good health. Within a few hours she was ill and shortly there were alarming symptoms, and so it is not a mere matter of opinion or conjecture that "plaintiff's illness originated after her use of defendant's product on March 31, 1955." As a matter of fact that was not the whole of the plaintiff's evidence and theory; she relies on the last application of the dye as the immediate onset of her malady but contends that by prior use she had become sensitized or allergic to the dye and that the last application and exposure produced a hypersensitivity reaction.

There may be some doubt whether there was definite, factual, scientific proof that she was "sensitized" by this particular ingredient, paraphenylenediamine. There is no testimony as to how the fact of the sensitizing process can be demonstrated or established, unless the fact of what eventually happened is sufficient to support the inference. However, as previously noted,

the doctors on both sides recognized the fact that paraphenylenediamine is a sensitizer. One of the plaintiff's dermatologists, the one with the list of articles, after examining the medical record and after answering the hypothetical question and after excluding other possible causes, said, "In my opinion, the periarteritis nodosa that has occurred in this patient is a hyper—a sensitivity reaction to—is due to a sensitivity reaction to paraphenylenediamine." A New York doctor, a specialist "in allergy of the heart and blood vessels," after examining the patient's medical record, after describing the three types of periarteritis nodosa, particularly the allergic type, inferentially gave it as his opinion that there was an absorption of dye through contact with the skin. This doctor concluded his opinion in this language, "Now, since she belongs to the allergic group, the question is what produced the allergy. * * * it is my opinion that there is a reasonable certainty that the dye which she applied the day before and which does produce purpura in a certain percentage of cases, indicating involvement of the skin vessels, and also does reduce the blood platelets, indicated a toxic effect on the blood elements, it's my opinion that there is a reasonable certainty of the relationship between the two. * * * The shock organs were the skin vessels, the kidney vessels, certainly the muscles which caused the blurring of the vision—the muscles of the eye, and the liver was enlarged at one time so the liver must have been involved although there was no biopsy done, and the lungs on one occasion showed congestion or infiltration—the X-ray diagnosis was congestion; that she had a pleura—it means that the vessels of the lungs were involved and also means that the pleural vessels were involved."

■ It may well be that lay jurors and lay judges are alike incapable of assessing and attributing the proper force and appropriate inferences to this and similar evidence, but it may not be confidently said that the witnesses have assumed and thus supplied the essential fact of sensitization, or of plaintiff's hypersensitiveness, as was the case with the physical object, a damper on a furnace, in Craddock v. Greenberg Mercantile Co., Mo.Sup., 297 S.W.2d 541. Nor is the testimony comparable to that of opinions based on facts which the law does not recognize as having probative force on the issues involved, as, for example, capacity to make a will. Berkemeier v. Reller, 317 Mo. 614, 296 S.W. 739; Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S.W.2d 664. In Schaefer v. Rechter, Mo.Sup., 290 S.W.2d 118, 123, the question was whether trauma to the chest of a patient with angina set off a series of anginal spasms which in turn caused the plaintiff's coronary occlusion. There was but one witness, a general practitioner with thirty-five years' experience, and while he had never seen or in his experience encountered such a case, he did testify that medical books mentioned the matter. The court, after exhaustively reviewing the Missouri cases on "medical opinion as substantial evidence of causation," held that the doctor's opinions were not wholly without "supporting 'reasons and testimony'" and constituted substantial evidence of the fact in issue. And here, for like reasons, it may not be said that the plaintiff's proof is so wholly without scientific or factual foundation as to constitute mere guesswork, speculation and conjecture. Brawley v. Esterly, Mo.Sup., 267 S.W.2d 655. Consequently, upon the specific reasons briefed and argued, it may not be said that the plaintiff did not make a case for the jury upon these issues. Schaefer v. Rechter, supra; Evinger v. Thompson, supra; Arnold v. May Department Stores, supra.

■■ Related to these problems is the appellant's objection to instruction one which in effect hypothesized and submitted the essence of the plaintiff's cause of action. What we have said upon the merits of the case disposes of the objection that the instruction authorizes the jury to "find as facts what are not actually facts, but a

series of speculative opinions expressed by plaintiff's medical witness on conflicting testimony." The further objection is made, however, that the instruction improperly assumes as a fact what was actually a hotly disputed matter of medical opinion, *"that plaintiff had acquired a sensitivity* to defendant's product." 53 Am.Jur., Secs. 605–606, pp. 477–478; 3 Am.Jur., Sec. 1106, p. 631; 39 Am.Jur., Sec. 117, p. 127. This fact, unquestionably, is most important and essential under the plaintiff's theory of her case and, as indicated, proof of the fact is not conspicuously impressive but we cannot say that the evidence is wholly without probative force. The instruction is quite lengthy and it is not necessary to set it out in full; it begins, however, with the conventional "if you find and believe from the evidence," following which is the hypothesized fact of the defendant's marketing Roux Oil Shampoo Tint which contained paraphenylenediamine and "that by reason of this ingredient * * * was dangerous in that it was certain to cause injury of local and systemic nature to some of the persons who used it upon their head and scalp to dye their hair, even though the percentage of those injured was not large and the great majority of persons would be safe using this product, and that such injury was most likely to occur *through sensitivity acquired by continued use of the product,* and if you further find that the defendant, Roux Distributing Company, Inc., knew, or by the exercise of ordinary care should have known this, then you are instructed that it was the duty of defendant, * * * to give the plaintiff an adequate warning * * *." Danger of systemic injury is mentioned in four other places in the instruction in connection with the directions for use of the dye, warning and proximate cause, but the emphasized quotation is sufficient to illustrate the objection and claim that the instruction does not submit but assumes as a fact that "plaintiff acquired a sensitivity." The first paragraph is a single sentence of twenty-five lines, there are two other similar paragraphs in the instruction, and it begins with the conventional "if you find and believe from the evidence" and the quoted clause is in the nineteenth printed line. It is not pointed out or demonstrated—it is only categorically stated—how or in what manner the fact is assumed, the only thing that could have left no doubt was an "if so" or another "if you find and believe from the evidence" (Cruce v. Gulf, Mobile & O. R. Co., 361 Mo. 1138, 1147, 238 S.W.2d 674, 679) immediately preceding the quoted clause. Willey v. Fyrogas Co., 363 Mo. 406, 251 S.W.2d 635, contains an illustration of an instruction's so erroneously assuming a fact as to require the granting of a new trial, but the instruction there is not comparable to this one and the compelling reasons there are not demonstrated or indicated here. Smith v. Harbison-Walker Refractories Co., 340 Mo. 389, 412, 100 S.W.2d 909, 920–921, contains an illustration of an instruction's setting forth essential facts in a vague and general manner, not clearly, and assuming silicosis "to be a disease peculiar or incident to the kind of work plaintiff was doing" so as to infringe the defendant's right to a fair trial of the issues. As said, it is not demonstrable that this instruction so infringes and if the jury understood this case and its complicated issues at all, it most certainly did not overlook this issue and was not misled by this instruction. The basic issues, including "sensitivity," were not hidden and, considered as a whole, the language of the instruction "furnishes the answer." Menke v. Rovin, 352 Mo. 826, 834, 180 S.W.2d 24, 27; Cruce v. Gulf, Mobile & O. R. Co., supra.

■ There being liability and not such error upon the trial of the cause as to demand the granting of a new trial, the defendant contends that the $85,000 judgment is so excessive as to require a remittitur. The plaintiff has been stricken with periarteritis nodosa; "it is a dread disease" but the nature and extent of her disability are not to be measured by what it "may involve," as the respondent states, but by

what is in fact involved. Periarteritis nodosa is a horrible malady, usually fatal, and Mrs. Braun was indeed ill and suffered, from both the malady and the treatment. She has not been cured and it is as likely, if she has the disease, that there has been a remission as it is that medical treatment has saved her life. She was first hospitalized two and one half months and returned on two or three occasions for blood transfusions and further treatment for anemia and chest pain. Immediately after her hospital confinement she was at home in bed and was treated at home. During her illness and confinement there was swelling in her ankles, knees, wrists and fingers, there was purpura, she "developed toxic kidney damage" indicated by the presence of albumin and red blood cells in her urine, there was kidney failure, fever, "a failure in the heart," foot drop, a loss of weight, double vision and, typical of periarteritis nodosa, involvement of the blood vessels. There were other manifestations, including one convulsive seizure while she was in the hospital, and pleurisy. It was her doctor's opinion that all of these symptoms were attributable to the disease but he does not say that all of these symptoms and manifestations have continued. Her blood pressure is now normal, there is some "fading rash" on her ankles, she has a definite weakness in her right leg indicating nerve damage, there is a weakness in her left hand, muscle wasting in the fourth and middle fingers, the heart and lungs are "fairly well within normal limits." The doctor was still administering digitalis "which is maintaining her heart, and she is not clinically on a physical examination in any heart failure." Somewhat in conclusion the doctor said, "she has suffered damage to the kidneys; she's suffered damage to the heart; she has suffered damage to the peripheral nerves as displayed by this weakness and paralysis of the left hand and in the left leg; it is displayed by the absent knee and ankle jerks on the right side" and there is "severe muscle irritability." As to the permanency of the outward or obvious manifestations the doctor said the probabilities were that her hand would not regenerate, that the weakness in her legs would not improve and that she would probably suffer some pain in the future and, as to future treatment, he said, "I certainly intend to keep up her medication now." At the time of the trial, March 1956, Mrs. Braun was able to be up and around some, could partially dress herself, "dust over the top of things," couldn't climb steps, or do normal housework and, she said, "I usually take a rest in the morning and a nap in the afternoon, and I lay around in the evening and watch television. That's about all the activity." As to whether she would ever be able to do "the normal chores of a housewife" the doctor said, "The probabilities are that she will not but, of course, it's possible and we're hoping and praying that she will." As with the facts and circumstances in general as well as with Mrs. Braun's prior medical history and treatment, we have not set forth every fact and circumstance connected with this malady and illustrated and demonstrated all the possibilities favorable and unfavorable, suffice it to say that periarteritis nodosa is a horrible malady that Mrs. Braun has been very ill and may continue to be.

■ There are of course no comparable cases, this being the first instance in the history of law or medicine of periarteritis nodosa caused by allergic reaction to paraphenylenediamine. There is no precise formula by which it may be determined whether and how much an award is excessive and it is not necessary in this case to again attempt an enumeration of all the factors considered on appeal; it is sufficient to note the general rule of uniformity (Counts v. Thompson, 359 Mo. 485, 222 S. W.2d 487; Smiley v. St. Louis-San Francisco Ry. Co., 359 Mo. 474, 222 S.W.2d 481) and the fact that the paramount factor is fair compensation in view of the nature, extent and permanency of the injuries. In connection with compensation and the nature and extent of the injuries consideration is given, among other factors, chang-

ing economic conditions (annotation 12 A. L.R.2d 611) and, in the absence of a closely identical instance, to the compensation awarded and approved in cases of fairly comparable injuries and losses. In support of her verdict the plaintiff relies on the single case of Douglas v. Twenter, 364 Mo. 71, 259 S.W.2d 353. There a housewife, age 46, with an expectancy of 23 years, had a verdict of $60,000. It is not necessary to detail her injuries, they were serious indeed and permanent. The court, nevertheless, reduced her judgment to $47,500. That case was decided in 1953 and it is urged, by reason of changed economic conditions and comparison of injuries, that it justifies this verdict of $85,000. Mrs. Braun's injuries are substantial, probably permanent, and "no normal person would voluntarily be afflicted with such injuries as plaintiff has received for any amount of money; but that cannot be the measure of damages in a court of law" (Counts v. Thompson, supra), particularly in view of our established remittitur practice and the governing rules. There are no precisely similar cases, but allowing for the changes suggested in the Counts case and acknowledging the possibility of error on the part of the court (Larson v. Atchison, T. & S. F. Ry. Co., 364 Mo. 344, 261 S.W.2d 111, 116), we are of the view that the judgment is excessive in the sum of $20,000. If, therefore, the plaintiff will enter a remittitur in the sum of $20,000 within fifteen days, the judgment will stand affirmed in the sum of $65,000 as of the date of the judgment, otherwise the judgment will be reversed and the cause remanded for a new trial.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

STORCKMAN, P. J., EAGER, J., and ELMO B. HUNTER, Special Judge, concur.

LEEDY, J., not sitting.