**Lucille JOHNSTON, Appellant,**

v.

**The UPJOHN COMPANY, Respondent.**

**No. 24996.**

Kansas City Court of Appeals.
Missouri.
April 7, 1969.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 1969.

Application to Transfer Denied
July 14, 1969.

Bundschu, Bailey & Disney, Kansas City, for appellant.

John R. Gibson, Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, for respondent.

HOWARD, Presiding Judge.

This is a products liability case involving the antibiotic Lincocin which is The Upjohn Company's trade name for Lincomycin. The petition was in three counts; the first count being against the treating physician; the second count against The Upjohn Company who manufactured the antibiotic; and the third count being the husband's separate cause of action for loss of services of his wife. A jury trial resulted in a nine-man verdict for $15,000.00 in favor of the plaintiff Lucille Johnston, and against The Upjohn Company. The jury found the issues in favor of the treating

physician as to both plaintiffs and against the husband on his separate cause of action. The trial court granted a new trial to The Upjohn Company on the ground of error in plaintiff's verdict-directing instruction. Plaintiff has duly appealed to this court from such order. There was no appeal from the judgment in favor of the treating physician and against the husband.

On this appeal the defendant Upjohn Company not only seeks to justify the action of the trial court in granting the new trial but strenuously asserts that plaintiff failed to make a submissible case and therefore judgment should be entered for the defendant. We shall examine this latter contention first since it may be dispositive of the entire case. Bailey v. Interstate Airmotive, Inc., Mo., 219 S.W.2d 333.

The evidence shows that prior to the occurrences here in question, the plaintiff Lucille Johnston had an anaphylactic reaction to an injection of penicillin and streptomycin which was almost fatal. On the occasion now being considered, Mrs. Johnston had a hurting in her ear and consulted Dr. Wurster who diagnosed her condition as otitis media (an infection of the middle ear) and indicated that she needed antibiotic treatment. She told the doctor and his nurse that she had had a reaction to penicillin and streptomycin the previous year; that her internist had advised her not to take any antibiotics and displayed to the doctor a medical alert bracelet that she wore reading "Penicillin—Streptomycin allergy" which had been prescribed by her internist. Dr. Wurster advised that he would use Lincocin and that she would have no ill effects therefrom. His nurse then gave plaintiff an injection of Lincocin and she was given a prescription for 15 pills or tablets containing Lincocin to be taken 3 each day. Plaintiff took the pills as directed.

The injection of Lincocin occurred on July 31, 1965. Plaintiff had no immediate reaction. Her testimony was that on the 8th of August, she felt a little under par and was tense. On the 10th or 11th of August,

she was experiencing a breaking-out on her face and severe itching. At that time she called her internist Dr. Lundgren. She was treated with ACTH and given creams for the swelling and breaking-out on her hands, face, neck and ears. Her condition temporarily improved but soon got worse again. She had swelling, breaking out, itching and blistering on her hands and arms, face, neck and ears, and over large portions of the rest of her body. The condition was such that the skin between her fingers broke. On Sunday, August 15, she went to St. Mary's Hospital at the direction of Dr. Lundgren's office where she was again given ACTH. On August 20, she entered St. Mary's Hospital where she was attended by Dr. Lundgren. At the hospital she was given ACTH and her body and extremities were wrapped in saline packs. She was also treated with Decatron cream. She testified that approximately 95% of her body was affected. Although her condition improved, the swelling and oozing still remained at the time she was discharged from the hospital on August 25. Plaintiff continued under the care of her doctor and continued to use the medications he prescribed. At the time of the trial she had itching, rash and swelling, and was not able to pursue her normal activities. Since no contention is made that the verdict is excessive, we do not need to further describe her condition.

As to the defendant Upjohn, plaintiff's cause was submitted to the jury by Instruction No. 9 on the basis that the defendant knew or should have known of the adverse effects of the drug Lincocin such as resulted to Lucille Johnston and failed to give a timely and adequate warning to her doctor of such adverse effects. It is on the basis of this submission that we must determine whether or not plaintiff made a submissible case as to defendant Upjohn.

■ The evidence showed that each package of Lincocin was accompanied by what is called a package insert concerning the properties of the drug, proper dosages,

precautions, etc. The plaintiff's doctor testified that he had read and was familiar with the contents of this package insert. In the case of prescription drugs such as Lincocin, warning to the medical profession in such manner is all that is required and constitutes warning to the patient as well. See Krug v. Sterling Drug, Inc., Mo., 416 S.W.2d 143. Among other things, the insert stated "Patients with otitis media [plaintiff's condition] * * * have been treated with good clinical results in the majority of cases." It was also stated "Lincocin has been administered to over 460 persons with known allergies (including persons reported to be allergic to penicillin). No serious hypersensitivity reactions have been reported in these patients and many patients have received repeated courses of Lincocin without developing evidence of hypersensitivity." Further, the insert advised "Cross resistance has not been domonstrated with penicillin, * * * streptomycin * * *"

Under the heading "Adverse Reactions", the following appeared:

"The most frequently observed side effect has been loose stools or diarrhea. As expected, this was observed almost exclusively in patients on oral therapy. Other adverse reactions reported in a small per cent of patients have been nausea, vomiting, abdominal cramps or pain, skin rash, rectal irritation, vaginitis, urticaris, and itching.

"Angioneurotic edema, serum sickness, anaphylaxis or other serious hypersensitivity reactions have not been reported. "Intramuscularly, Lincocin has demonstrated excellent local tolerance and reports of pain following injection have been infrequent.

"Intravenous administration of Lincocin in 250 to 500 ml. of 5 per cent glucose in distilled water or normal saline produced no local irritation, phlebitis or systemic side effects."

In her brief plaintiff argues that taken as a whole, this package insert constituted an affirmative assurance of safety in its use. However, plaintiff did not submit on this theory and there was no evidence that would support a finding that such assurance was negligently given. Plaintiff submitted on the basis that defendant knew or should have known of danger of serious reaction such as occurred to plaintiff and failed to warn of such danger. We are constrained to hold that there is no evidence to support this submission. The package insert in evidence is dated May 1965. The evidence was that the wording of this insert was the same as that dated late in 1964 when the drug Lincocin was first available to the public.

Lincocin was developed by The Upjohn Company over a period of years and involved a large amount of chemical and laboratory testing and finally testing on human volunteers. At the time of the original application to the Food and Drug Administration for certification, it had been used on approximately 2,400 human volunteers. The original package insert and the insert dated May 1965 were based upon the information contained in the original application. It had not been updated. However, plaintiff has not offered any evidence that the warning contained in the package insert under Adverse Reactions was not accurate. There is no evidence of any knowledge on the part of the defendant Upjohn of any reaction which would not be accurately covered by the information contained under the heading "Adverse Reactions." In other words, there is no evidence that Upjohn knew of a reaction different to those described in the package insert or of a reaction more severe. Likewise, there is no evidence of any reactions different from those described in the package insert or more severe than those described, which Upjohn could have known about by use of the proper degree of care. For all the evidence shows Mrs. Johnston may be the first person to have such a severe reaction or a reaction in any way different from those described.

True, one of defendant's witnesses on cross-examination testified that Upjohn

had continued to receive reports of adverse reactions from doctors administering the drug Lincocin between the time of the preparation of the original package insert and the time of the injection of the plaintiff on July 31, 1965. These reports of adverse reactions were passed along to the Food and Drug Administration as required and the package insert was not changed in light of these additional adverse reaction reports. However, there was no evidence that any change was called for; there was no evidence in the case whatsoever as to the nature of the adverse reactions so reported to Upjohn. For all that the evidence shows, each and every one of these reactions may be fairly includable in the information disclosed under Adverse Reactions on the package insert in evidence.

Plaintiff relies primarily on the two Missouri cases of Bine v. Sterling Drug, Inc., Mo., 422 S.W.2d 623, and Krug v. Sterling Drug, Inc., Mo., 416 S.W.2d 143, as supplemented by the opinion of the United States Court of Appeals for the Eighth Circuit in Sterling Drug, Inc. v. Cornish, 370 F.2d 82. All three of these cases concerned the drug Chloroquine phosphate sold by the Sterling Drug Company under the trade names of Aralen, Triquin and Plaquenil. This drug was developed in 1946 for the prevention and treatment of malaria. It was later learned that larger doses of the drug were useful in treating arthritis and lupus erythematosus. The evidence in these cases showed that beginning in 1959, there was increasing medical evidence that the use of the drug might result in a disease later called chloroquine retinopathy which results in blindness. The court in these cases held that such evidence of medical knowledge created a jury issue as to whether the manufacturing company knew or in the exercise of the required degree of care could have known of this dangerous reaction and negligently failed to warn thereof. In one case, the evidence showed that the company responded with bland assurances of safety to an inquiry by plaintiff's treating physician. As stated in Bine v. Sterling Drug, Inc., supra, the situation was as follows:

"It is not necessary to review all the record that might bear on this issue because this is sufficient to demonstrate that there were both scientific tests and medical knowledge, literature, reports, and questions as early as 1957 and certainly by 1960 connecting Aralen with serious retina damage by which Sterling 'knew or by using ordinary care could have known of the danger of eye damage'; or, stated yet another way, 'Sterling knew or had reason to know that some persons would be injured by the drug's side effects.' Yarrow v. Sterling Drug, Inc., supra, 263 F.Supp. 159, l. c. 162. Also in this connection, the manufacturer of a prescription drug to be administered to human beings is ' "held to the skill of an expert in that particular business" and "to an expert's knowledge of the arts, materials and processes," and is bound to keep reasonably abreast of scientific knowledge and discoveries concerning his field and, of course, is deemed to possess whatever knowledge is thereby imparted." ' Krug v. Sterling Drug, Inc., supra, 416 S.W.2d l. c. 152 [8]."

█ The duty of one manufacturing drugs for human use is set out in Krug v. Sterling Drug, Inc., 416 S.W.2d 143, l. c. 152, as follows:

"* * * If this is not sufficient to dispose of this particular claim, it would appear that the manufacturer and distributor of a prescription drug to be administered to human beings, as with the manufacturer of a weed killer or a hair dye, should be 'held to the skill of an expert in that particular business' and ' "to an expert's knowledge of the arts, materials and processes," and is bound to keep reasonably abreast of scientific knowledge and discoveries concerning his field and, of course, is deemed to possess whatever knowledge is thereby

imparted.' Braun v. Roux Distributing Company, Mo., 312 S.W.2d 758, 1. c. 763; La Plant v. E. I. Du Pont De Nemours and Company, 346 S.W.2d 231, 1. c. 240–241. * * *"

In all of the cases cited by the parties, including Arnold v. May Department Stores Co., 337 Mo. 727, 85 S.W.2d 748, and Braun v. Roux Distributing Company, Mo., 312 S.W.2d 758, the evidence clearly showed that there was knowledge available that the product would cause serious damage to some who could reasonably be expected to use it and a duty to warn could be found. Thus, in Arnold v. May Department Stores Co., supra, the court said, 85 S.W.2d 1. c. 753:

"Gerkin v. Brown & Sehler Co., 177 Mich. 45, 143 N.W. 48, 53, 48 L.R.A.(N. S.) 224, was to recover for injuries alleged to have been caused by wearing a fur lined coat with a dyed collar, which collar, it was alleged, poisoned the neck. Plaintiff bought the coat from a local dealer who had bought it from the defendant, a jobber. In the course of the opinion, the court said: 'When the fact is once established and demonstrated by experience that a certain commodity apparently harmless contains concealed dangers, and when distributed to the public through the channels of trade and used for the purposes for which it was made and sold is sure to cause suffering to, and injure the health of, some innocent purchaser, even though the percentage of those injured be not large, a duty arises to and a responsibility rests upon the manufacturer and dealer with knowledge to the extent, at least, of warning the ignorant consumer or user of the existence of the hidden danger.' "

■ This is in contrast to the evidence in the case at bar which is almost completely silent on the subject. There is no evidence that anyone had ever suffered a reaction to Lincocin different in nature or more serious than that described in the package insert. If such reaction had never occurred before, defendant could not know about it or in the exercise of the required degree of care, could not have found out about it, and absent knowledge of such reaction, there could be no duty to warn. Braun v. Roux Distributing Company, Mo., 312 S.W.2d 758. As said in Volume 2, Harper and James, The Law of Torts, Section 28.7, page 1550:

"One factor which conditions the taking of precaution is the knowledge or means of knowledge of the danger. If the maker is justifiably ignorant of a danger in his product there is no negligence in a failure to guard against it * * *"

■ The evidence of all of the doctors who testified in the case, including plaintiff's doctor, was that they had used the drug Lincocin and had administered it to patients with a prior history of allergic reaction to penicillin without any serious adverse results. The doctors did say that they considered the statement that Lincocin had been administered to over 460 persons with known allergies with no serious reactions, to be unduly reassuring and disarming to the treating physician but this does not supply the necessary knowledge or means of knowledge in the defendant which is the prerequisite of a duty to warn. Absent such showing the plaintiff cannot recover in the case at bar.

This conclusion obviates the need for our consideration of the alleged errors in plaintiff's verdict-directing Instruction No. 9. It follows that the order granting a new trial for such errors in instruction must be reversed and the causes remanded to the trial court with directions to enter judgment for defendant The Upjohn Company. It is so ordered.

CROSS, J., and HARRY A. HALL, Special Judge, concur.

SHANGLER, J., not participating.