James DOE and C. Doe, et al.,
Plaintiffs/Appellants,

v.

ALPHA THERAPEUTIC
CORPORATION,
Defendant/Respondent.

No. ED 74307.

Missouri Court of Appeals,
Eastern District,
Division Three.

Oct. 5, 1999.

Jan Adams, The Holloran Law Firm, St. Louis, for appellants.

Philip S. Beck, Adam L. Hoeflich, Andrew L. Goldman, Bartlit, Beck, Herman, Palenchar & Scott, Chicago, IL, Robert Haar, Susan Bindler, Haar & Woods, St. Louis, for respondent.

PAUL J. SIMON, Presiding Judge.

James and Carol Doe, the parents of Jimmy Doe, John Doe, and Jim and Marla Doe (collectively plaintiffs) appeal from a judgment entered on a jury verdict in favor of Alpha Therapeutic Corporation (Alpha) in an action in tort by or on behalf of persons with hemophilia who were treated with blood products contaminated with human immunodeficiency virus (HIV).

On appeal, plaintiffs contend the trial court erred in: (1) admitting videotaped testimony of Dr. Harry Meyer (Dr. Meyer) after plaintiffs had been deprived of their absolute right to completely cross-examine this key witness at the time the videotaped testimony was elicited because the doctor's uncontroverted testimony that the Food and Drug Administration (FDA) would not allow Alpha to issue a warning and that heat treating factor concentrates was "bad," materially affected the merits of the

case and caused severe prejudice to plaintiffs; (2) allowing Alpha to introduce evidence and argue that blood products from other manufacturers could have caused plaintiffs' injuries because Alpha's only expert witness on the issue of causation and plaintiffs' only expert witness on the issue of causation both testified that Alpha caused the injuries, and there was not evidence controverting that testimony; (3) submitting Instructions 11, 27, and 29 on the affirmative defense of learned intermediary because (a) there was no jury instruction defining Alpha's duty to warn the doctors about what it knew concerning the risk of acquired immunodeficiency syndrome (AIDS) in light of the misrepresentations contained in the newsletters it mailed to the parents and (b) there is an exception to the learned intermediary defense where a drug company engages in direct-to-consumer advertising, thus precluding reliance on the doctrine as an affirmative defense; and (4) failing to preclude the issuance of any order taxing costs to plaintiffs because Alpha's motion for costs includes costs for all depositions taken in MDL–986 (multi-district litigation) and for depositions taken in case master case No. 91–09608, which were not prorated among the 59 plaintiffs consolidated under the master case and includes costs not approved by Missouri statutes. We affirm.

The record, consisting of a four volume pretrial transcript, 13 volume trial transcript, post trial transcript, 8 volume legal file and numerous trial exhibits, viewed in a light most favorable to the verdict, reveals that plaintiffs were persons, or family members of persons, with hemophilia, a sex-linked, inherited disorder characterized by a deficiency of either Factor VIII or Factor IX proteins. Factor VIII and Factor IX are clotting agents that control bleeding. Due to the lack of Factor VIII or Factor IX, hemophiliacs suffer from delayed clotting of the blood and have difficulty in controlling hemorrhage. The severity of the clotting disorder depends upon the extent to which the hemophiliac lacks these clotting agents. In order to limit or treat bleeding, hemophiliacs are injected with blood products, donated by others, which contain the missing clotting factor. Plaintiffs Jimmy, John, and Jim Doe suffered from a lack of Factor VIII and were diagnosed with severe hemophilia. They were infected with HIV contracted through contaminated blood products used to treat their condition. HIV is the virus that causes AIDS.

Jimmy, John, and Jim Doe controlled their bleeding with infusions of Cryoprecipitate and Factor VIII concentrate, which was prescribed by their physicians. Cryoprecipitate is made by freezing blood plasma from one donor, thawing it, and drawing off a precipitate rich in Factor VIII. Cryoprecipitate must be specially frozen and administered through intravenous fluids at a hospital. Factor VIII concentrate is processed from frozen plasma donated by thousands of donors. The Factor VIII is extracted from the pool of plasma, freeze-dried, and refrigerated until use. For use, the concentrate is reconstituted with sterile water and, much like a diabetic, the patient can self-administer the Factor VIII concentrate. If left untreated for viruses, both Cryoprecipitate and Factor VIII can transmit HIV and Hepatitis B. However, the risk of transmission is much greater with Factor VIII concentrate because it is made from the plasma of numerous donors, while Cryoprecipitate is made from the plasma of a single donor.

Alpha is a California corporation authorized to do business in the State of Missouri and is engaged in the business of manufacturing, processing, marketing, distributing and selling various pharmaceutical products, including Factor VIII concentrate.

The FDA regulates manufacturers of Factor VIII concentrate, or fractionators. Fractionators are licensed by the FDA to process and distribute Factor VIII concentrate. The FDA must approve the release of each lot of Factor VIII concentrate before the lot may be distributed for use.

The FDA must further approve any change in a fractionator's manufacturing process or in the labeling of the product.

Jimmy Doe was born on October 20, 1975, and diagnosed with hemophilia when he was three days old. For the next three years, he went to the hospital for treatments of cryoprecipitate. Beginning in 1980, he began using Factor VIII concentrate produced by Alpha and used this product through 1983 and for nearly all of 1984. In 1986, he was diagnosed HIV positive and about five years later he was diagnosed with AIDS. He died of an AIDS related illness at the age of nineteen.

John Doe was born in 1969, and used Factor VIII concentrate manufactured by Alpha from 1980 through 1983. He tested positive for HIV at the age of sixteen and was diagnosed with AIDS in 1990 at the age of twenty-one.

Jim Doe was born in 1953 and initially used whole blood or plasma to treat his condition. From 1965 to 1975, he was treated with Cryoprecipitate and, subsequently, began to use Factor VIII concentrate. From 1978 through 1984 he used Factor VIII concentrate manufactured by Alpha. He tested positive for HIV in 1989 and was forty-three at the time of trial. However, he has since died from an AIDS related illness.

The record reveals that AIDS first came to the attention of the medical community in the United States in June of 1981 with the identification of twenty-six homosexual men with opportunistic diseases. The first report of AIDS in hemophiliacs occurred on July 16, 1982 when the Center for Disease Control (CDC) reported in their Morbidity and Mortality Weekly Report (MMWR) that three hemophiliacs had been diagnosed with symptoms associated with AIDS, a then unidentified disease that had previously been recognized only among homosexual males, intravenous drug abusers and Haitians. Although the cause of the disease was unknown, the CDC alerted the directors of hemophilia centers about these cases and, along with the National Hemophilia Foundation (NHF), initiated a collaborative surveillance of the problem. In addition, it encouraged physicians who treated hemophilia patients to report any cases in which the symptoms of AIDS were diagnosed.

In response to the CDC report, the NHF issued an alert to hemophilia patients, but noted that the risk of contracting [AIDS] was "minimal" and the CDC was not recommending any change in blood product use. Days prior to the publishing of the MMWR of July 16, 1982, Alpha and other manufacturers of plasma fractionation products were made aware of the three cases discussed in the MMWR and were invited to a special meeting with the CDC and the FDA's Office of Biologics to discuss the possibility that hemophiliacs using blood products were at risk for AIDS.

In December of 1982, four more hemophiliacs were diagnosed with AIDS. On December 10, 1982, the National Hemophilia Foundation issued a Newsnote reporting the status of the AIDS epidemic and its spread throughout the population of hemophilia patients. Though the cause of AIDS was still unknown, the Newsnote suggested the possibility that AIDS was transmitted through contaminated blood and blood products.

On December 15, 1982, Alpha sent an in-house memo to its Sales Force. The memo focused on the fact that several hemophiliacs had been diagnosed with AIDS, that no cause of the disease had been identified, and that Alpha was taking steps to eliminate high risk donors from their donor population. There is no indication in the record that at that time Alpha had any knowledge superior to that of the CDC, NHF or the general medical community regarding the infectious nature of AIDS, the identity of its causative agent or the risk the disease posed to hemophiliacs who used Factor VIII concentrate.

By January of 1983, there was a strong suspicion among the medical community

that AIDS was an infectious disease. Epidemiological evidence from the CDC's investigations strongly suggested that blood and blood products transmitted the agent causing AIDS and that the disease could also be transmitted through intimate heterosexual contact. By February of 1983, there were twelve confirmed cases of AIDS among hemophiliacs. However, the agent causing the disease was still unidentified. Though in-house Alpha correspondence indicates that in January and February 1983 it was aware that hemophiliacs using Factor VIII were at an increased risk for AIDS, it does not indicate that Alpha's knowledge regarding that risk was superior to that of the CDC, NHF or the general medical community.

In the spring of 1983, amidst increasing evidence that AIDS was transmitted by blood, the NHF and the CDC recommended that all previously untreated patients, newborns, and those who have received few treatments of Factor VIII be treated with Cryoprecipitate. However, they also recommended that patients who already received numerous treatments of Factor VIII concentrate continue with that course of treatment. The recommendations were based on the theory that if an infectious agent was being transmitted by blood and specifically by contaminated Factor VIII concentrate, those who received Factor VIII concentrate in the past would have already been exposed to the agent.

The record indicates that during the Spring of 1983, Alpha was attempting to eliminate high risk donors from their donor population, while at the same time attempting to develop a Anti Hemophilic Factor derived from plasma absent of anti-HBC markers, which were thought to be markers for AIDS. Further, Alpha was in the process of proposing labeling changes to the FDA for their Factor VIII concentrate. The proposed changes were to include a cautionary statement regarding the potential transmission of AIDS by blood products. However, such labeling was not to be initiated until FDA approval was obtained.

Throughout the Spring of 1983, information regarding the cause of AIDS surfaced. As of May 31, 1983, the agent causing AIDS remained unknown, though all indications were that AIDS was a new infectious agent. By the Summer of 1983, it was clear that AIDS was transmitted through blood and that hemophiliacs were being exposed to the disease through contaminated blood products used to treat their condition.

In its 1983 summer newsletter, Alpha discussed the latest issues regarding the AIDS crisis. It reported that it had stepped up efforts to protect hemophilia patients from AIDS, but suggested that there was new evidence that AIDS was not necessarily associated with blood or blood products.

On November 25, 1991, John Doe filed his lawsuit against Alpha. Jimmy and Jim and Marla Doe filed their lawsuit against Alpha on April 15, 1992. Upon the death of Jimmy Doe, his parents, James and Carol, filed their wrongful death claim.

On May 12, 1993, plaintiffs' cases were consolidated for pre-trial purposes with twelve similar cases under a Master Case, David Doe v. Alpha, et al, Cause No. 91–09608, with leave to consolidate all future similar litigation under the Master Case. Plaintiffs' case was originally set for trial on January 17, 1994, however, pursuant to a number of continuances, the trial did not take place until December 1, 1997.

On February 2, 1994, MDL–986 was initiated in the United States District Court for the Northern District of Illinois, Eastern Division, to economize the pre-trial discovery in all Factor VIII or IX Concentrate Blood Products litigation filed in federal courts. On that same day, the United States, a defendant in several cases in the MDL, designated Dr. Meyer as one of its witnesses who "may be called to testify" regarding "AIDS/blood products/anti-viral drugs/the role of FDA in connection with

the manufacturing process of blood fractions during his time as Director" of the FDA's National Center for Drugs and Biologics. Subsequently, the Honorable James Sanders, duly appointed Special Master in all cases consolidated under the Master Case, approved coordinating pretrial proceedings in the subject cases with the pretrial proceedings in MDL–986.

Although plaintiffs' first petitions are not included in the record, the record reveals that on February 23, 1995, James and Carol filed their first amended petition individually and on behalf of Jimmy pursuant to section 537.080 RSMo 1994 (all further references will be to RSMo 1994 unless otherwise indicated) against Alpha, alleging that Jimmy had purchased Factor VIII from Alpha and, as a result of his use of Factor VIII, had contracted Hepatitis and HIV. They alleged that Alpha owed them a duty of care for Jimmy's safety in "manufacturing, processing, marketing, distribution, and sale of Factor VIII," and had breached its duty by negligently committing one or more of the following acts or omissions:

    (a) marketed a product for human consumption which it knew or should have known would infect consumers with the AIDS virus because it solicited blood donors from a segment of the population known to have a high incidence of contracting the AIDS virus and used said donors' blood to manufacture Factor VIII;

    (b) failed to adequately warn plaintiffs about the risk of contracting AIDS through injection and infusion of Factor VIII;

    (c) failed to provide adequate quality control or quality assurance in the manufacturing, processing, marketing, distribution, and sale of Factor VIII;

    (d) failed to adequately screen donors through written questions and verbal questions in an environment which is conducive to candid answers in order to detect donors at high risk of carrying the AIDS virus;

    (e) failed to medically examine donors by qualified medical personnel to determine if

    donors have symptoms indicating they are at high risk for carrying the AIDS virus;

    (f) failed to test the blood ultimately used to manufacture Factor VIII to determine if it was fit for consumption;

    (g) failed to heat treat the Factor VIII sold to plaintiff in such a manner as to reduce the risk of contracting AIDS;

    (h) failed to withdraw the product from the market place.

James and Carol alleged that the aforementioned acts or omissions constituted aggravating circumstances and that Alpha caused, or contributed to cause, Jimmy's medical condition and, as a direct result, he suffered damages including: (1) a permanent destruction of his immune system which would ultimately result in his death; (2) tremendous pain and suffering and severe physical and mental disabilities; (3) great emotional anguish; (4) social ostracism and fear of losing employment; (4) loss of income; (5) extraordinary medical expenses; and (6) wrongful death.

In Count II of their amended petition, James and Carol Doe alleged that Alpha had provided "pharmaceutical detailmen and printed material" to Jimmy, his treating physicians, and distributors of Factor VIII and that the information provided was designed to inform the user of the risks and benefits of using Factor VIII products. However, the information did not include the additional risks associated with Factor VIII when Alpha knew that Factor VIII and Factor IX products could transmit the causative agent of AIDS. In addition, they alleged that Alpha did not inform Jimmy, his treating physician, and the distributors of Factor VIII of the benefit of heat treatment for the product. They alleged that Alpha was guilty of fraudulent and/or negligent misrepresentation for representing to Jimmy that the risk of contracting AIDS through Factor

VIII was slight and recommending that he not withhold treatment of his disease by use of Factor VIII products. They alleged that Jimmy relied on Alpha's representations in making his purchases of Factor VIII and that those representations caused Jimmy's medical condition and its aforementioned associated conditions.

Finally, in Count III of their amended petition, James and Carol Doe alleged that Alpha had breached their implied warranty because the defect in Factor VIII could have been detected and/or removed by a reasonable use of scientific procedures or techniques and that Alpha knew or should have known of the use for which the Factor VIII was purchased. However, when sold to Jimmy, the product was not fit for such use. Thus, James and Carol alleged that Alpha's conduct caused Jimmy to become infected with the AIDS virus, which caused Jimmy's death. Soon thereafter, John Doe filed his second amended petition on March 12, 1996 and Jim and Marla Doe filed their first amended petition on September 29, 1997. Both petitions essentially mirrored the allegations made by James and Carol Doe in their first amended petition.

In answering the petitions, Alpha admitted that it was a California corporation and that it processed and distributed factor concentrates. It denied all other allegations and asserted twenty affirmative defenses, the most pertinent of which are: (7) the injuries of James and Carol Doe and/or Jimmy Doe were proximately caused by an intervening or superceding cause because Jimmy used factor concentrate from several manufacturers in addition to Alpha and Jimmy was injected or transfused with other products, and by persons knowledgeable about the risks of those products; (10) to the extent Alpha supplied any antihemophilic factor, Alpha owed no duty to James and Carol Doe and/or Jimmy Doe, as the factor concentrate was supplied by learned intermediaries, fully knowledgeable about the factor concentrate and its uses, thus, Alpha did not have a duty under the learned intermediary doctrine; (13) at all times Alpha conformed its conduct to the applicable state of medical and scientific knowledge in all material respects; (14) Alpha's methods regarding factor concentrates and all attended advisory procedures conformed with the state of the art at the time the factor concentrates left the possession of Alpha; (16) the alleged injuries and/or damages were the result of unavoidable circumstances that could not have been prevented by anyone in that AIDS was not identified until 1984 and no test licensed until 1985.

The record reveals that the government designated Dr. Meyer, the former director of the FDA's Center for Drugs and Biologics, as one of its expert witnesses for cases in the MDL in which the government was a defendant. On January 17, plaintiffs in MDL–986 gave notice to all counsel that the "Plaintiffs' Steering Committee" would be taking discovery depositions of persons named by defendants. Five days later, plaintiffs' counsel in the instant case filed its notice of deposition of the witnesses identified in MDL–986 stating that "any party or their attorney may appear and participate as they see fit. Subsequently, the record reveals that in April 1997, Dr. Meyer gave a discovery deposition and was questioned by attorneys for the various plaintiffs and defendants. Significantly, Dr. Meyer's testimony during that discovery deposition proved to be favorable to Alpha.

On June 27, 1997, Alpha filed its Cross–Notice of Taking Deposition of Dr. Meyer from July 22–25, 1997 for the purpose of eliciting testimony to be used at trial in MDL–986 and all state and federal cases not in MDL–986. Three days later, Alpha filed its Cross–Notice of Taking Deposition of Dr. Meyer in regards to plaintiffs' cases in the circuit court.

Dr. Meyer's deposition took place at the Friday Harbor Inn, Friday Harbor, Washington. On July 22, plaintiffs' counsel from Missouri conducted its discovery de-

position. On July 23, Alpha conducted a videotaped deposition eliciting trial testimony. The record does not indicate which portions of the deposition were included in the edited video that was played at trial. However, the record reveals the substance of Dr. Meyer's testimony was that, while it was technically possible to heat treat factor concentrates as early as the 1970's, during the 1970's and early 1980's, it was not considered feasible because "Factor VIII was a fragile product that lost potency rapidly when subjected to heat." Also, the FDA did not approve the first heat treatment process for Factor VIII until 1984. Further, his testimony focused on the fact that, if "the fractionators had wished to send out similar information as was being distributed by the Public Health Service and its entities regarding their product, the Factor VIII and Factor IX concentrates," they would have needed the prior approval of the FDA, which was not given until the beginning of 1984. Alpha completed its direct examination of Dr. Meyer on July 24, at which point plaintiffs' counsel from Indiana and New Jersey conducted their cross-examination, which lasted until the end of the day on Friday, July 25. Although plaintiffs' counsel in the instant case was present for the entire deposition and was scheduled to cross-examine Dr. Meyer for approximately one hour, it was not permitted to conduct cross-examination because of time constraints. It offered to conduct its questioning of Dr. Meyer the next day, a Saturday. Stating that Dr. Meyer's deposition was not noticed for Saturday, that there was "no place for some counsel to stay," and that they were trying to conclude the deposition by at least 5:00 p.m. on Friday, July 25, the government declined the offer.

Trial was set to begin in September of 1997 and on August 12, 1997 Alpha filed its motion to admit Dr. Meyer's testimony or to continue trial until the completion of his testimony. In its motion, Alpha stated that Dr. Meyer was one of the "most important witnesses" in the cases and had worked for the FDA during the relevant period and had "critically important testimony" on the issues of viral inactivation and warnings. It alleged that plaintiffs' counsel unsuccessfully attempted to stop and/or stall him from testifying and prevented the completion of his testimony.

On August 13, 1997, plaintiffs filed their motion to strike expert witnesses disclosed by defendant and to prohibit him/her from testifying at trial, alleging that they had not been given the opportunity to cross-examine Dr. Meyer.

On August 18, 1997, plaintiffs filed their response to Alpha's motion to admit Dr. Meyer's testimony or continue trial until the completion of his deposition. In their response, plaintiffs stated that depositions in MDL–986 were "divided into discovery depositions and trial depositions" and that the trial court in MDL–986 had stayed Dr. Meyer's deposition. However, Alpha and "the other fractionators" had noticed the deposition in all state cases but postponed the deposition in all states except Indiana, New Jersey, and Missouri. Plaintiffs alleged that they attended Dr. Meyer's deposition from July 22–25 and that the following events occurred:

July 22, 1997 Discovery deposition conducted by Missouri plaintiff's counsel

July 23, 1997 Trial deposition – direct examination conducted by Defense counsel but not completed.

July 24, 1997 Direct examination by Defendants completed. Indiana plaintiff cross-examination; Defendants object and interrupt for ruling by Indiana state court judge.

July 25, 1997 New Jersey cross examination began but was not completed; Deposition suspended by Government Counsel; Missouri plaintiff's counsel was not permitted opportunity to cross-examine the witness.

Plaintiffs maintained that Alpha's accusations that plaintiffs stalled Dr. Meyer's deposition were false and alleged that Alpha had not made Dr. Meyer available for cross-examination. Finally, plaintiffs stat-

ed that they had "waited six years for their day in court," and thus opposed any continuance.

The record indicates that on August 21, 1997, there was a "Hearing on Motions" before the Special Master. At that hearing, the Special Master addressed Alpha's motion to admit Dr. Meyer's testimony or to continue the trial until the completion of his deposition. Alpha contended that plaintiffs had "abundant opportunity to cross-examine" Dr. Meyer but had engaged in a "concerted effort to prevent" him from testifying. Further, Alpha stated that during his July deposition, the discovery deposition by plaintiffs that "should have taken less than an hour took an entire day." Alpha stated that though it had confirmed that his testimony would be limited to the subjects of his discovery deposition, plaintiffs questioned him "about things like the intentional tampering with Tylenol," and "Cutter brochures that had nothing to do with Alpha," and "a game called 'Factor Man'." Alpha alleged that plaintiffs' questioning of Dr. Meyer was "well beyond the scope" of what it had confirmed he would be testifying about and that it took an entire day. Further, Alpha alleged that once it began its direct examination of Dr. Meyer, plaintiffs constantly interrupted the questioning. Moreover, Alpha argued that plaintiffs' counsel had the opportunity to cross-examine Dr. Meyer the next day, however, their questioning was repetitive. Alpha alleged that plaintiffs had the opportunity to examine Dr. Meyer for more than a week, however, they made "it so the testimony was not completed."

Plaintiffs' counsel denied Alpha's allegations, and stated that plaintiffs' counsel had "spent one day examining Dr. Meyer," but did not cross-examine him during that "one day" and "did not ask any duplicative questions that were asked in the prior discovery deposition." Plaintiffs' Counsel alleged that the "problems with the deposition" were a result of Dr. Meyer's refusal to answer questions and the actions of two

attorneys from the United States Department of Justice who "continually objected to the questions of the lawyers" and were constantly late in conducting the deposition. Plaintiffs' counsel stated that she, the attorney from Indiana, and the attorney from New Jersey had three separate orders regarding Dr. Meyer's deposition and had to engage in three separate depositions with him, but Alpha would "not agree to it, and they went forward with one direct and three crosses."

At the hearing on August 21, the Special Master said that plaintiffs' counsel was "entitled to finish the cross-examination" of Dr. Meyer, giving them "ten days in which to try to get his [deposition] set up prior to the September trial." He further said that the September trial would proceed if the cross-examination could be done in "a timely manner." However, if Dr. Meyer could not be deposed prior to trial, he "would recommend that the case be continued," and it would "be up to [the trial judge] to decided whether or not he's going to grant the continuance."

On September 5, 1997, plaintiffs filed their memorandum in response to Alpha's motion to admit testimony of Dr. Meyer or to continue trial. In that motion, plaintiffs alleged that defendants' counsel had noticed Dr. Meyer's trial testimony in three separate state court cases, however, plaintiffs' counsel was not given the opportunity to cross-examine him at the July deposition. Plaintiffs' counsel stated that its only participation in his trial deposition was to join in the "objections of other plaintiffs' counsel" and that "throughout the four-day deposition period," defense counsel continuously attempted to limit Dr. Meyer's cross-examination. Alleging that defense counsel was responsible for any delays, plaintiffs' counsel requested that the trial court issue a finding that their conduct was proper under the circumstances.

On September 11, plaintiffs' counsel filed their motion for protective order deposition of Dr. Meyer, alleging they spent

approximately 150 hours and over $6,000.00 in preparation and attendance of his July deposition, but had not been given the opportunity to cross-examine him. Plaintiffs' counsel alleged that Dr. Meyer refused to provide responsive answers and should not be allowed to testify before a jury in the City of St. Louis, unless a judge was present to "exercise appropriate control" at the deposition. Further, plaintiffs' counsel argued that although Alpha had offered to produce Dr. Meyer for cross-examination on September 29, 1997, in San Juan, an island off the coast of Washington, it would be unduly burdensome for plaintiffs' counsel to travel back to San Juan to complete the deposition. Thus, plaintiffs' counsel asked that the trial court order Alpha to produce Dr. Meyer for the completion of his deposition in St. Louis.

On September 22, 1997, Alpha filed their response to plaintiffs' motion for protective order deposition of Dr. Meyer stating that he was not "retained by, paid by, or controlled by Alpha or the other fractionators," and that Dr. Meyer did not live in St. Louis and Alpha did not have the ability to force him to come to St. Louis. Alpha stated that Dr. Meyer declined to travel to St. Louis and that plaintiffs should take his deposition where he agreed to testify. Alpha claimed that plaintiffs' allegations in their motion were baseless, untrue, and incorrect, and that if plaintiffs found it unduly burdensome to travel to San Juan for Dr. Meyer's deposition, they could "take the deposition over the telephone" as they had many times in the past.

On November 24, 1997, a pretrial hearing was conducted regarding the various motions filed by plaintiffs and Alpha. At the hearing, the trial court heard arguments regarding the use of Dr. Meyer's deposition at trial. Plaintiffs argued that Alpha failed to produce Dr. Meyer for completion of cross-examination and that they should be precluded from using his testimony at trial. Alpha contended that it

had no control over Dr. Meyer, that it could not compel him to appear to testify and that plaintiffs had ample opportunity to conduct cross-examination, but failed to do so. Alpha also argued that if plaintiffs wanted to cross-examine Dr. Meyer, they should have subpoenaed him. The trial court took "all these matters under submission" and the parties have not directed us to the disposition of these matters, nor have we been able to locate them.

The next day, plaintiffs filed their motion to strike deposition designations of Dr. Meyer, alleging that Alpha sought to submit video trial testimony of Dr. Meyer, though plaintiffs had not been given the opportunity to cross-examine him. Plaintiffs alleged that they were not required to subpoena Dr. Meyer and that there "was no assurance that Alpha" could make him available for cross-examination should the trial court grant another continuance. Accompanying their motion are a series of letters sent by plaintiffs' counsel to the various defense attorneys claiming that Alpha reported that Dr. Meyer would be "made available for completion of his deposition in the Missouri cases on September 29, 1997 in coordination with his MDL deposition."

Soon thereafter, Alpha filed its response to plaintiffs' motion alleging that there was no distinction in Missouri between a "discovery deposition" and a "trial deposition" and that before the "trial deposition" in MDL–986 scheduled for July 22–25, 1997 took place, plaintiffs' counsel demanded that it be given an opportunity to take a Missouri-specific deposition. Alpha alleged that the separate deposition by plaintiffs' counsel lasted the entire day of July 22, and the deposition was completed. They further stated that the questioning by plaintiffs' counsel lasted "almost two full days" and the MDL–986 trial deposition was set to resume in September 1997. Alpha claimed that plaintiffs' counsel failed to have Dr. Meyer's deposition rescheduled within the 10 days after the August 21 hearing before the Special Master.

Further, Dr. Meyer's trial deposition in MDL–986 was "tentatively set for resumption either on September 25–26 or during the week of September 29." Alpha alleged that on September 11, 1997, plaintiffs filed a motion to require Dr. Meyer be produced in St. Louis, however, "plaintiffs did not call this motion for hearing" and did not want to resume Dr. Meyer's deposition because "defendants would be able to use it in the MDL." Alpha maintained that it was "plaintiffs' obligation to schedule another session" with Dr. Meyer and that they had "defaulted on this obligation." Thus, Alpha argued that it should not be precluded from defending itself with the testimony of a "key government witness." Here also, the parties have not directed us to the disposition of these matters, nor have we been able to locate them.

Trial began on December 1, 1997, and plaintiffs presented their evidence including the: (1) videotaped deposition of Dr. Charles Heldebrant (Heldebrant), the Director of Technical Affairs for Alpha; (2) testimony of Rosemary Piepert, the widow of Larry Piepert, a hemophiliac who died from complications from AIDS in 1991; (3) videotaped deposition of Dr. Donald Francis, of the Centers for Disease Control (CDC); (4) portions of a deposition by Al Jagodensky, a St. Louis salesman for Alpha; (5) testimony of James Doe; (6) the videotaped deposition of Dr. Oscar Ratnoff; (7) testimony of Dr. Donald Graham; (8) testimony of Marla Doe, Jim Doe, and Dr. John Bouhassin (Bouhassin), a physician and pediatrician hematologist, who treated Jimmy and John Doe; (11) the videotaped depositions of Dr. Bruce Evatt (Evatt), of the CDC, Dr. William London, Dr. Frank Putnam, an expert on heat-treating factor concentrates, and Dr. Ian Mitchell; (15) portions of depositions by Bruce Bolmstrom, Thomas Peter Stagnaro, Wilfred De Hart, William Hartin; (16) testimony of Dolly Doe, the mother of John Doe; and (17) testimony of John Doe. In its defense, Alpha presented the: (1) testimony of Heldebrant; (2) videotaped deposition of Dr. Meyer; (3) video-taped deposition of Evatt; and (4) testimony of Dr. Louis Aledort (Aledort), an expert regarding cryoprecipitate and factor concentrates.

At trial, James Doe testified that he and his wife relied on Dr. Bouhassin, Jimmy Doe's treating physician, to provide relevant information and to make medical judgments for Jimmy's care. However, he testified that Dr. Bouhassin did not inform them that factor concentrates might have been carrying "whatever was causing AIDS." James Doe also testified that Dr. Bouhassin never discussed with him or his wife whether they wanted Jimmy switched from factor concentrates to Cryoprecipitate. Further, he testified that it was not until "late '84, early '85" that Dr. Bouhassin discussed switching Jimmy from non-heat-treated factor concentrates to heat-treated factor concentrates.

Jim Doe testified that to his recollection he had used only Alpha factor concentrates between 1979 and the first quarter of 1984. He testified that his doctor, the late Dr. Weiss, himself a hemophiliac, never informed him of the possible risks of using factor concentrates over the risks of using Cryoprecipitate. He testified that Dr. Weiss had "lots of literature around" relating to hemophilia treatment and the use of related products and that Dr. Weiss would "try to give it to us, but I normally didn't take it." Jim testified that he began using heat-treated factor in "late 1984" because Dr. Weiss said it was a "much safer product to use."

Upon cross-examination, Jim stated that in 1982 Dr. Weiss informed him that in all probability he had already been exposed to the AIDS virus and that there was a risk from the factor concentrates, however, the risk was minimal. Upon being presented with a January 1983 newsletter signed by Dr. Weiss stating that "Blood transmission of AIDS is now almost certain," and recommending that "all patients using Factor VIII Concentrates switch to the Red Cross product at least temporarily," Jim testified

that "this kind of information" was available in Dr. Weiss' office. However, he didn't pick up the newsletter or ask Dr. Weiss any questions about it.

Dr. Bouhassin testified that he had been the doctor for John and Jimmy Doe. Dr. Bouhassin testified that in his opinion John and Jimmy Doe acquired the HIV virus from "contaminated Factor" and that if the factor concentrates they had used from 1980 through 1983 came from Alpha, then Alpha Factor VIII concentrate would have been the "causative agent." Further, Dr. Bouhassin testified that although Jim had not been his patient, he had reviewed his records and opined that contaminated factor concentrates had caused Jim to become infected with HIV and that if he had used Alpha Factor VIII concentrate, it would have caused his HIV infection. Dr. Bouhassin estimated that John, Jimmy, and Jim Doe were infected with HIV sometime in the "calendar year 1983."

Upon cross-examination, Dr. Bouhassin testified hepatitis was "widely understood" to be a risk in blood products "back in the 1970's" and that there was "kind of the big risk" that other known and unknown viruses could be transmitted through blood products. Further, his cross-examination reveals that he was aware of the CDC's July 16, 1982 MMWR, which reported that three hemophiliacs had been diagnosed with the symptoms of AIDS. He also was aware of the NFH Newsnotes and letters being sent out at that time to the medical community regarding AIDS and its implications for hemophiliacs. Dr. Bouhassin also testified on cross-examination that in October of 1982 he called the CDC and spoke with Dr. Lawrence regarding AIDS. The substance of what Dr. Lawrence told him was, that at the CDC, the most widely held theory was that AIDS was caused by a virus and that this virus could be transmitted through blood and blood products. Dr. Bouhassin further testified that in late 1982 and early 1983 he knew AIDS was "most probably" an infectious disease transmitted by blood and blood products

and, in giving the "best information that [he] could on a current basis to [his] patients," he began warning his patients that AIDS and other diseases might be transmissible through blood transfusions.

He further testified that in 1983 he was attempting to make decisions for his patients regarding factor concentrates · because there was news in the scientific community about AIDS and the possible transmission of AIDS in human blood. He stated that the National Hemophilia Foundation (NHF) and CDC were sending out "alerts and Newsnotes and things like that," regarding risks associated with factor concentrates and that he was advised in 1983 to start using cryoprecipitate rather than factor concentrates with "certain categories of patients," including previously untreated patients, new babies who had not been "exposed to anything" and people with low levels of usage of "whatever it was that they were taking." However, he was also advised not to change therapy for people who had been taking a fair amount of factor concentrates for a long time.

Dr. Bouhassin stated that he was aware of doctors removing their patients from factor concentrates due to "information available to the medical community" regarding the transmission of the AIDS. However, at that time he did not "believe that the preponderance of the evidence" warranted removing his patients from factor concentrates. Moreover, he testified that he saw a newsletter Alpha sent out regarding the risks of AIDS and blood products. Dr. Bouhassin did not remember when he saw the newsletter and testified that it was "not a decisive thing" in his treatment decisions because he had already made his decision as to which patients he was going to "switch" from factor concentrates to Cryoprecipitate.

Heldebrant testified that he had been employed at Alpha for twenty-two years and that from 1981 through 1985 he had been the Director of New Products Research and had "conceived, directed and developed the heptane heat-treated" factor

concentrates. Heldebrant testified that there came a time in 1981 and 1982 when Alpha started working on heat treatment and that Alpha applied for FDA approval of heat treatment in December 1982. He stated that FDA approval was necessary for any process regarding the treatment of plasma, and that Alpha did not receive FDA approval for heat treatment until February 1984.

Heldebrant also testified that he first learned that a German company "was out there claiming that they could heat Factor VIII and kill hepatitis but still keep the medicine alive" from a memo he received in August 1981. He stated that he had been working on heat treatment and knew it could kill viruses in the plasma, however, he did not believe it would leave the Factor VIII alive. Heldebrant testified that upon receiving the memo, he re-examined whether or not it was possible to use heat treatment without killing Factor VIII. He stated that he tested heat treatment on Factor VIII in early 1982 and that based on his research he could not do what the German company said they could do.

Heldebrant testified that around the spring of 1982, Alpha had "picked up some information" about a new dry heating process that was effective in killing viruses. He testified that as of September 1982, Alpha had not been able to heat treat Factor VIII successfully, but continued its work on heat treatment and tested the new dry heating process. In December 1982, Alpha approached the FDA for approval of its heptane heat treatment process. Finally, Heldebrant testified that Alpha did not develop the heptane heat treatment process earlier because the "idea to heat the dry powder and not the solution" did not exist.

At the conclusion of Heldebrant's testimony, "54 minutes of the several day deposition" of Dr. Meyer was played before the jury. Plaintiffs objected to the testimony of Dr. Meyer on the grounds that counsel did not have the opportunity to cross-examine him, but those objections were overruled.

Aledort also testified for Alpha stating that he was the medical director of the NHF from 1968 through 1983 and thereafter took a position on its Medical and Scientific Advisory Council. Aledort testified that in 1983, "nobody really had hard data" to say that the risk of contracting diseases of the blood, specifically AIDS, from cryoprecipitates was different from the risk associated with factor concentrates, and the NHF constantly said "We do not know whether the association of this disease with blood is more or less with one versus the other."

Aledort testified that in 1982, as soon as new information regarding AIDS was discovered, it was transmitted to the public consisting of the hemophilia treatment center doctors and the patients "through their chapters." He stated that as of September 1982, the cause of AIDS was unknown, though the most widely held theory was that if it was a virus, it could be transmitted to individuals through contact with blood or blood products from infected patients or by intimate contact with certain secretions from infected patients. Aledort testified that he had helped the NHF distribute a survey regarding the prevalence of a new virus in the blood to doctors treating hemophilia patients, including Dr. Bouhassin at Cardinal Glennon Hospital. Aledort stated that in the winter of 1982, the NHF recommended that "existing treatment methods for hemophiliac patients continue since it is not clear what is causing AIDS," and that, "cryoprecipitate be used for newly diagnosed patients, patients with mild hemophilia, newborns, and children under four."

He further testified that in July 1983, the NHF's position was that if an individual with AIDS was found to have donated plasma, then those materials should be recalled and taken from patient use, but in his personal opinion, AIDS was not a virus carried in the blood and he was opposed to a national policy recalling any product

traced to a donor with AIDS, even though Alpha had voluntarily withdrawn any such product. In addition, Aledort testified that there was "enormous reluctance" to use heat-treated product when it first "came out."

During his direct examination, Aledort placed the time of infection for Jim, Jimmy and John at sometime by November 1981, with an outside of October 1982. Upon cross-examination, Aledort testified that if all Jimmy, Jim, and John Doe had used to treat their conditions in 1980 through 1983 was "Alpha product," then there was a very high probability that Alpha provided the Factor VIII product which gave them AIDS. Further, he testified that if the heat-treatment developed by Alpha in 1983 had been available in 1980, then many people using blood products would not have been infected with HIV, developed AIDS, and died. However, he qualified his testimony, stating that it was not until 1984 that "we knew heat treatment could kill the virus."

On December 16, 1997, prior to the close of the evidence, Alpha's exhibits, specifically Exhibits 15F, 15G, 15H, 15I, and 15J which summarized the blood products plaintiffs used from 1978 through 1984, were admitted into evidence without objection from plaintiffs.

After the close of the evidence, the case was submitted to the jury on plaintiffs' negligence, failure to warn and breach of implied warranty claims with separate verdict directing instructions for James and Carol Doe, John Doe, and Jim Doe. Alpha submitted its affirmative defense in instructions 11, 19, and 27, to which plaintiffs objected, on plaintiffs' failure to warn claims, setting forth the learned intermediary doctrine:

Instruction No. 11 – 19 – 27

On the claim of plaintiff Jim [John, James and Carol] based on failure to use ordinary care to adequately warn of the risk of harm from AIDS, your finding must be for defendant if you believe

Jim's treating physician, Dr. Andrew Weiss [Dr. John Bouhassin], was aware of the information that should have been provided to plaintiff concerning the risk of contracting HIV from the use of factor concentrate.

On December 17, 1997, the jury returned verdicts in favor of Alpha.

On January 15, 1998, plaintiffs filed their motion for new trial contending that: (1) the verdicts for Alpha were against the weight of the evidence; (2) the trial court erred in allowing Alpha to introduce evidence of and argue that blood products from manufacturers other than Alpha could have caused plaintiffs' injuries, where there was no evidence to support the argument and Alpha's only expert witness testified that Alpha caused the injuries "to a high degree of probability;" (3) Alpha failed to properly edit videotaped testimony of witnesses used at trial; (4) Alpha submitted Jury Instruction Nos. 11, 19, and 27, pursuant to its affirmative defense of learned intermediary, which is not a viable defense under the facts of this case and the laws of Missouri; (5) Alpha submitted the videotaped trial testimony of Dr. Meyer, even though plaintiffs' counsel was not given the opportunity to cross-examine Dr. Meyer; and (6) the cumulative effect of the alleged errors warranted a new trial.

On January 22, 1998, Alpha filed its Motion for Costs, requesting an award of $47,973.54. Soon thereafter, plaintiffs filed their Motion to Review Costs, alleging that the bill of costs submitted by Alpha improperly included charges prohibited by Missouri statutes, including depositions taken in MDL–986 and the Master Case. Plaintiffs prayed that the trial court deny Alpha's request in its entirety or, in the alternative, award Alpha costs in the amount of $4,902.88. There is no evidence in the record that the trial court ruled on either motion. However, on April 13, 1998, the trial court denied plaintiffs' motion for new trial.

Initially, we address plaintiffs' third point, in which they contend the trial court erred in submitting affirmative defense instructions 11, 19, and 27 on the learned intermediary doctrine (doctrine) because (a) there was no jury instruction defining Alpha's duty to warn the doctors about what it knew concerning the risk of AIDS in light of the misrepresentations contained in the newsletters it mailed to the patients, and (b) there is an exception where a drug company engages in direct-to-consumer advertising, thus precluding the reliance on the doctrine as an affirmative defense. Alpha responds that a learned intermediary instruction was appropriate since Dr. Bouhassin and Dr. Weiss were fully informed about the possible risks of AIDS in factor concentrates and their knowledge. "broke the causal connection between Alpha's alleged failure to warn and plaintiffs' injuries." Further, Alpha argues that there is no applicable exception to the doctrine and the learned intermediary instruction did not prejudice plaintiffs since there "was overwhelming evidence that plaintiffs were warned of the possible risks of AIDS by their doctors."

■ A party must make specific objections at the jury instruction conference and in their motion for new trial in order to preserve a matter for appellate review. Rule 70.03. The burden of proof on an affirmative defense rests with the proponent of the defense. *Stewart v. K–Mart Corp.*, 747 S.W.2d 205, 208 (Mo.App. E.D. 1988). An instruction must be supported by substantial evidence which, if true, is probative and from which the jury can reasonably decide the case. *Seidel v. Gordon A. Gundaker Real Estate Co., Inc.*, 904 S.W.2d 357, 363 (Mo.App. E.D.1995). In reviewing an instruction, we view the evidence and inferences in a light most favorable to the instruction and disregard contrary evidence. *Id.* To reverse on grounds of instructional error, the party challenging the instruction must show that the offending instruction, misdirected, misled or confused the jury. *Id.*

■ We note that plaintiffs did not object to the language of Instructions No. 11, 19 and 27. Further, the record does not indicate that plaintiffs requested an instruction as to an exception to the learned intermediary doctrine or preserved that issue for review. At trial, plaintiffs' objection was to the fact that a learned intermediary instruction was given. In their Motion for New Trial, plaintiffs again objected only to the giving of a learned intermediary instruction, "arguing that the doctrine of learned intermediary is not a viable defense under the facts of this case and the laws of the State of Missouri." Therefore, the only issues preserved for our review is whether there is evidence which supports the giving of the learned intermediary instruction and whether the instruction was in accord with Missouri law.

■ Missouri courts adhere to the learned intermediary doctrine. *See Krug v. Sterling Drug, Inc.*, 416 S.W.2d 143, 146 (Mo.1967); *See Johnston v. Upjohn Co.*, 442 S.W.2d 93, 95; *Kirsch v. Picker Intern., Inc.*, 753 F.2d 670 (8 th Cir.1985). *cf. Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852, 860–63 (Mo.banc 1993). Missouri courts have held that in cases involving manufacturers of prescription drugs, the manufacturer has "a duty to properly warn the doctor of the dangers involved and it is incumbent upon the manufacturer to bring the warning home to the doctor." *Krug v. Sterling Drug, Inc.*, 416 S.W.2d 143, 146 (Mo.1967).

■ The learned intermediary doctrine is a corollary to the rule that a manufacturer of prescription drugs or products discharges its duty to warn by providing the physician with information about risks associated with those products. *Christopher v. Cutter Laboratories*, 53 F.3d 1184, 1192 (11 th Cir.1995). The physician acts as a "learned intermediary" between the manufacturer and the patient and any warning given to the physician is deemed a warning to the patient. *Kirsch*

*v. Picker Intern., Inc.,* 753 F.2d 670, 671 (8 th Cir.1985); *Johnston v. Upjohn Co.,* 442 S.W.2d 93, 95 (Mo.App.1969). The learned intermediary doctrine provides that the failure of a drug manufacturer to provide the physician with an adequate warning of the risks associated with a prescription product is "not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that the adequate warnings should have communicated." *Cutter* at 1192; *See also Callahan v. Cardinal Glennon Hospital,* 863 S.W.2d 852, 860–63 (Mo.banc 1993). Thus, the causal link between a patient's injury and the alleged failure to warn is broken when the prescribing physician had substantially the same knowledge as an adequate warning from the manufacturer that should have been communicated to him. *Cutter* at 1192.

■ Here, Alpha offered evidence to support its affirmative defense instructions. The record reveals that Dr. Bouhassin, who was John Doe and Jimmy Doe's treating physician, and who prescribed Alpha Factor VIII concentrate for them from 1980 through 1983, was aware that known and unknown viruses could be transmitted through blood products "back in the 1970's." Further, Dr. Bouhassin was aware of the risks associated with blood products and the transmission of AIDS as early as 1982. Dr. Bouhassin kept informed of the latest developments in the AIDS crisis. He read the CDC MMWRs and NHF Newsnotes on the subject. Further, Dr. Bouhassin testified that in October of 1982 he called the CDC and spoke with Dr. Lawrence regarding AIDS. The substance of what Dr. Lawrence told Dr. Bouhassin was that at the CDC the most widely held theory was that AIDS was caused by a virus that could be transmitted through blood and blood products.

Although Dr. Bouhassin testified that he saw Alpha's allegedly misleading summer 1983 Newsletter, he stated that it did not play a role in his treatment decisions. In fact, he testified that when it came to

making treatment decisions, he took the advice of the NHF and its Medical and Scientific Advisory Council, who worked in conjunction with the CDC. In the spring of 1983, the NHF recommended continuing Factor VIII concentrate treatment of patients who had already been treated with a fair amount of it. Although he was aware of information available to the medical community regarding the risks associated with blood products, Dr. Bouhassin relied on the advice of the NHF and CDC. Moreover, he did not believe that the "preponderance of the evidence" warranted removing his patients from factor concentrates. As a result, he decided not to switch John and Jimmy Doe from Factor VIII.

Though Dr. Weiss, who prescribed Factor VIII concentrate to Jim Doe, died prior to trial, the record indicates he was aware of the risks associated with AIDS and Factor VIII concentrates as early as 1982. Jim testified that in 1982, Dr. Weiss informed him that, in all probability, he had already been exposed to the AIDS virus and that, although there was a risk from the factor concentrates, the risk was minimal. The record indicates that by January 1983, Dr. Weiss was well aware of the risk of AIDS associated with Factor VIII concentrate. In fact, Dr. Weiss was almost certain that the agent causing AIDS was transmitted by blood. Exhibit 912 is a January 1993 Regional Comprehensive Hemophilia Center Newsletter by Dr. Weiss, which reports in pertinent part:

> Blood transmission of AIDS is now almost certain...The "AIDS agent" appears to have a long incubation period (weeks or months) followed by a long prodomal" period during which there are mild but increasing symptoms for many months...In an attempt to minimize the risk of exposure to the "AIDS agent," we are recommending that all patients using factor VIII concentrates switch to the Red Cross product, at least temporarily. These concentrates like the commercial brands, are prepared from large pools of donors and the risk

that one infectious donor may contaminate the entire pool with hepatitis virus or AIDS agent is still there.

Upon being presented with the newsletter, Jim testified that "this kind of information" was available in Dr. Weiss' office, but he didn't pick up the newsletter or ask Dr. Weiss any questions about it. Jim further testified that he Jim did not use heat-treated factor until "late 1984," when Dr. Weiss informed him that it was a "much safer product to use."

Under these circumstances, there is evidence that Dr. Bouhassin and Dr. Weiss were aware of the risks of AIDS associated with the use of blood products, specifically factor concentrates, when they prescribed them to plaintiffs. Further, they independently possessed substantially the same knowledge of the risk of AIDS associated with blood products that Alpha possessed. Because their treating physicians were already aware of the risk of AIDS associated with Factor VIII concentrates, Alpha's alleged failure to provide an adequate warning cannot be the proximate cause of plaintiffs' injuries. *Kirsch* at 671. Thus, we find that there was sufficient evidence to support instructions Nos. 11, 19, and 27 and that these instructions properly instructed the jury regarding the learned intermediary doctrine. Plaintiffs' third point is not meritorious.

■ Next we consider plaintiffs' first point on appeal, contending that the trial court erred in admitting Dr. Meyer's videotaped deposition testimony after plaintiffs' counsel had been deprived of its absolute right to completely cross-examine this key witness at the time the testimony was elicited. Plaintiffs argue that allowing the jury to hear Dr. Meyer's testimony that the FDA would not allow Alpha to issue a warning and that during the 1970's the prevailing school of thought in the scientific community was that heat treating factor concentrates was "bad," materially affected the merits of the case and caused them severe prejudice. Plaintiffs claim that if they had been given the opportunity to conduct a complete cross-examination of Dr. Meyer, they would have elicited three material admissions by Dr. Meyer, which contradict his videotaped deposition testimony. In support of their argument, plaintiffs direct us to a segment of the legal file where Dr. Meyer's deposition, given during the MDL cross-examination on April 30, 1998, appears.

Alpha argues that the trial court's decision to admit Dr. Meyer's testimony was correct because: (1) Alpha did not prevent plaintiffs from cross-examining Dr. Meyer; rather, after examining Dr. Meyer, plaintiffs' counsel made a tactical decision not to cross-examine him in the hope of excluding his testimony; (2) plaintiffs made no effort to subpoena Dr. Meyer for deposition; and (3) plaintiffs' request to exclude Dr. Meyer's testimony was untimely.

■ The trial court has substantial discretion in ruling on the admissibility of testimony and its ruling will not be disturbed on appeal absent an abuse of discretion. *Smith v. Kovac,* 927 S.W.2d 493, 500 (Mo.App. E.D.1996). Such abuse occurs only when the ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful, deliberate consideration. *House v. Missouri Pacific Railroad Co.,* 927 S.W.2d 538, 540 (Mo.App. E.D.1996).

■ Moreover, we recognize that "a party to a cause, civil or criminal, against whom a witness has been called and given some evidence, shall be entitled to cross-examine said witness ... on the entire case[.]" Section 491.070. Further, the right to cross-examine a witness who has testified for the adverse party is absolute and not a mere privilege. *Pettus v. Casey,* 358 S.W.2d 41, 44 (Mo.1962).

Here, Dr Meyer, former Director of the FDA's Center for Drugs and Biologics, was a paid expert witness for the government in cases in the MDL in which the government was named as a defendant.

Thus, Dr. Meyer was not under the control of Alpha and Alpha could not direct Dr. Meyer to make himself available to testify. However, Alpha designated Dr. Meyer as a non-retained expert witness and Dr. Meyer agreed to make himself available to provide testimony from July 22 through July 25, 1997. Subsequently, plaintiffs' counsel from Missouri conducted its discovery deposition of Dr. Meyer on July 22, 1997. Alpha then conducted its direct examination of Dr. Meyer eliciting testimony that was used at trial. He testified that if in 1983 "the fractionators had wished to send out similar information as was being distributed by the Public Health Service and its entities regarding their product, the Factor VIII and Factor IX concentrates," they would have needed the prior approval of the FDA, which was not given until the beginning of 1984. He further testified that in the 1970's and early 1980's heat treating factor concentrates was not considered feasible because "Factor VIII was a fragile product that lost potency rapidly when subjected to heat." He testified that the FDA did not approve the first heat-treatment for Factor VIII until 1984. Dr. Meyer was then cross-examined by plaintiffs' counsel from Indiana and New Jersey, in the presence of plaintiffs' counsel from Missouri. However, plaintiffs' counsel from Missouri was not permitted to cross-examine Dr. Meyer because time expired on Friday July 25, 1997, the deposition was not noticed for Saturday, and defense counsel "had nowhere to stay."

Subsequently, on August 12, 1997 Alpha filed its motion to admit Dr. Meyer's testimony or to continue trial until the completion of his testimony. At the August 21 hearing on motions, the Special Master gave plaintiffs' counsel ten days from the date of the hearing to see if they could procure Dr. Meyer's deposition prior to trial, otherwise he would recommend a continuance. Plaintiffs' counsel failed to schedule Dr. Meyer's deposition prior to the September trial date, and the trial was continued until December. Further, the record reveals that Alpha offered to produce Dr. Meyer for cross-examination by plaintiffs' counsel on "September 25–26 or during the week of September 29," 1997, in coordination with his MDL deposition. However, plaintiffs declined to cross-examine Dr. Meyer at that time and filed a motion for a protective order deposition. The motion stated that it would be "unduly burdensome for plaintiffs' counsel to travel back to San Juan [an island off the coast of Washington] to complete the deposition." However, plaintiffs never called the motion for hearing. Further, plaintiffs failed to schedule Dr. Meyer's deposition prior to December and failed to subpoena him to procure his cross-examination.

Therefore, the record reveals that plaintiffs' counsel had adequate time and opportunity to completely cross-examine Dr. Meyer, but failed to take advantage of such opportunity. They were present at his April 1997 discovery deposition, and conducted another discovery deposition on July 22, which lasted the entire day. In addition, they were present during the two and one half days that plaintiffs' counsel from Indiana and New Jersey cross-examined Dr. Meyer. Further, they failed to call for hearing their motion for a protective order deposition. Finally, they failed to schedule the cross-examination during September and did not attempt to subpoena Dr. Meyer. Clearly, the trial court's ruling was not against the logic of the circumstances or so unreasonable or arbitrary that it indicates a lack or careful, deliberate consideration. Point denied.

■ In their second point on appeal, plaintiffs contend that the trial court erred in allowing Alpha to introduce evidence, i.e. Alpha's exhibits 15F–J, which are summaries of plaintiffs' use of factor concentrates, and to argue that blood products from other manufacturers could have caused plaintiffs' injuries. Plaintiffs first raised this issue on September 10, 1997, when they filed their motion in limine No. 3, asking the trial court to prohibit, in limine, Alpha from mentioning in opening

statement, presenting any evidence, and/or arguing to the jury that any exposures to factor concentrates during the calendar years 1978, 1979, 1984, and 1985 caused plaintiffs to become infected with HIV. The trial court denied the motion and plaintiffs failed to object to the admission of the evidence at trial.

A motion in limine is, by its nature, interlocutory. *Derossett v. Alton & Southern Ry. Co.*, 850 S.W.2d 109, 111 (Mo.App. E.D.1993). Therefore, in order to preserve the point for review, a specific objection must be made at the time the evidence discussed in the motion in limine is introduced at trial. *Id.* Plaintiffs failed to object to Alpha's exhibits 15F–J. Their Point is denied.

In their fourth point on appeal, plaintiffs claim the trial court erred in failing to preclude the issuance of any order taxing costs to plaintiffs because Alpha's motion for costs includes costs for all depositions taken in MDL–986 and for depositions taken in master case No. 91–09608, which were not prorated among the 59 plaintiffs consolidated under the master case. Additionally, plaintiffs argue that Alpha's motion for costs includes costs not approved by Missouri statutes. Responding, Alpha argues plaintiffs' request for an order addressing the taxation of costs is not ripe for review since the trial court has not yet ruled on the issue.

Alpha filed a motion for costs in the trial court on January 26, 1998, requesting that the trial court award it costs in the amount of $47,973.54. On February 17, 1998, plaintiffs filed their motion to review costs submitted by Alpha, requesting that trial court deny Alpha's request in its entirety. The record indicates that although judgment was entered for Alpha, the trial court did not rule on either motion and the costs have not been assessed. Plaintiffs' claim as to the trial court's ruling is premature. *See Brown v. Lanrich, Inc.*, 950 S.W.2d

235, 238 (Mo.App. E.D.1997). Point denied.

Judgment affirmed.

KATHIANNE KNAUP CRANE, J. and LAWRENCE E. MOONEY, J., concur.